C. F. MUELLER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21600. Promulgated May 25, 1950.

*Harry J. Rudick, Esq.*, and *Mason G. Kassel, Esq.*, for the petitioner.
*Charles Oliphant, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $136,438.62 in the income tax of the petitioner for the period beginning August 28 and ending December 31, 1947. The sole issue for decision is whether the petitioner is exempt from tax under section 101 (6) of the Internal Revenue Code. The case was submitted upon a stipulation of facts, which is hereby adopted in its entirety as the findings of fact. Some of those facts are mentioned herein, but all have been carefully considered.

The petitioner was incorporated under the laws of Delaware on August 21, 1947. Its return for the taxable period was filed with the collector of internal revenue for the fifth district of New Jersey.

C. F. Mueller Co., a New Jersey corporation, hereafter referred to as the old company, took over a business established in 1867 and had been engaged since 1905 in the manufacture and sale of macaroni and similar products, all hereafter referred to as macaroni. It was a taxable business corporation, successfully engaged in commercial activities for profit in competition with other similar corporations. Henry Mueller, its president, died in November, 1946. He owned 4,724 shares out of 7,860 shares of its capital stock then outstanding. The stock was valued for estate tax purposes at $360 per share.

H. T. Sorg, a person not connected with New York University, conceived the idea of acquiring all of the stock of the old company on behalf of the Law School of New York University. He made inquiries of a representative of the Muellers as to the possibility of acquiring all of the outstanding stock of the old company, and in February, 1947, discussed his idea with Arthur T. Vanderbilt, then Dean of the Law School of New York University. The university had a large enrollment, a relatively small endowment, charged students less than cost, and needed funds with which to operate.

Sorg, representing Vanderbilt, and a group of other persons interested in the law school, negotiated successfully with the stockholders of the old company for the purchase of the stock and with Prudential Insurance Co. of America for a loan to finance the purchase.

The petitioner was incorporated in order to carry out the plan of acquiring the stock, and it acquired all 7,860 shares of the outstanding stock of the old company on August 28, 1947, at a price of $3,495,057.60, $466.66 per share, in an arm's length transaction. It financed the pur-

chase by borrowing $3,550,000 from the Prudential Insurance Co. of America. The loan was to be repaid within 15 years. The Prudential Insurance Co. required in the loan agreement that the petitioner have the power to carry on the business, that it continue the business, and that it take over seven-year employment contracts of three employees of the old company. The loan agreement also required that 75 per cent of the income of the petitioner be used to reduce the loan to $1,500,000 and thereafter that further payments be made, and provided, in effect, that the payments or other distributions to New York University could not exceed 25 per cent of the excess of the net earnings over the net losses of the petitioner until the debt was paid.

The petitioner agreed to pay Sorg a commission of $124,250 for his services.

It is stated in the certificate of incorporation of the petitioner that it "is organized exclusively for charitable, scientific, literary, and/or educational purposes and no part of its income or property shall inure to the private benefit of any stockholder, director, or officer, or any individual or corporation other than New York University for the exclusive benefit of its School of Law"; the directors are authorized to distribute to the university for the exclusive benefit of the law school such part of the property and net income of the petitioner as they may determine and as may be distributable legally; and the objects for which the petitioner was formed are, *inter alia*, to manufacture and sell macaroni and kindred food products. The certificate contained a detailed statement of the usual powers of a business corporation which the petitioner was to have. Those objects and powers are almost identical with those of the old company.

The petitioner and the old company entered into an agreement of merger on August 28, 1947. The agreement recites that the petitioner and the old company had been "organized for the purpose of carrying on business of the same or of a similar nature" and provides "the corporate identity, existence, purpose, powers, franchises, rights and immunities" of the old company shall be fully vested in the petitioner, which was to continue to exist and be governed by the laws of the State of Delaware. The merger agreement contains statements similar to those in the petitioner's articles of incorporation in regard to its purpose and objects. It provides that the profits or assets available for distribution are to be paid from time to time at the discretion of the directors to New York University for the exclusive benefit of the law school and that the assets are also to be distributed to New York University for the exclusive benefit of the law school in case the petitioner is terminated. Shares of the old company were to be canceled.

The above steps were all taken pursuant to a plan to acquire the business of the old company and make its income available for the uses

and purposes of the Law School of New York University. The form was adopted in an effort to achieve, if possible, tax exemption for the petitioner under section 101 (6) of the Internal Revenue Code.

The total authorized stock of the petitioner consisted of ten shares, each of the par value of $100. All of those shares are to be held for ten years by voting trustees under a voting trust agreement dated August 28, 1947, after which they are to be transferred to New York University. The trust exists solely for voting purposes. The petitioner's capital of $1,000 was contributed by Vanderbilt, who considered it a contribution to New York University. None of the voting trustees received compensation, except one, who received $4,000 as compensation for services as president of the petitioner.

The petitioner, since August 28, 1947, has carried on the business formerly conducted by the old company, using the same plant and office facilities, the same banking facilities, and the same trade-marks, and without any noteworthy change in manufacturing operations, sales policies, advertising policies, employees, or clientele. Certain officers and key employees of the old company were retained in the petitioner to assure continuance of the old management. They included the executive vice president, the vice president in charge of production, the comptroller, the director of purchasing, the supervisor of packing, and the chief engineer. The first named was also a director of the petitioner, beginning March 25, 1948. The other directors of the petitioner were persons who had attended New York University and had not been directors of the old company.

The Mueller trade-name is well known and is extensively advertised. The average annual expenditures for advertising for the five years ended with 1947 were approximately $273,000. The net taxable income of the old company for 1946 amounted to $962,366.75, on which the tax was $365,040.67. The net income of the petitioner for the short period here involved was $359,890.51. The gross sales of the old company and of the petitioner for the calendar year 1947 amounted to over $9,000,000, and the selling, delivery, administrative, and general expenses for that period amounted to about $1,380,000, including amounts for social security taxes, and for deductible contributions to charities. The average number of employees for that year was 530. It was one of the largest operators, and there is some evidence that it was the largest, in the industry.

The petitioner distributed $75,000 to the University for the law school on December 28, 1948, and ordered another similar distribution of $100,000 for December 31, 1949. It paid $600,000 on the Prudential loan in 1948.

No substantial part of the petitioner's activities has consisted of carrrying on propaganda or otherwise attempting to influence legislation.

New York University is a nonsectarian institution which does not receive financial support from either the City or the State of New York. Its student population is drawn from all parts of this and foreign countries and is probably the largest in the world. The university has derived its income primarily from student fees, gifts, and bequests. Its endowment is about $11,577,400.

New York University is, and was for the taxable year, an institution exempt from Federal income tax under the provisions of section 101 (6). It was not engaged in the manufacture or sale of macaroni, except for its interest in the petitioner, and the business of the petitioner is in no way related to the educational activities of the university, except in so far as it produces income for the university. No part of the net earnings of the petitioner, except the payments pursuant to the loan agreement, can be distributed other than to New York University for the benefit of the law school.

The only question for decision is whether the petitioner is exempt from tax under section 101 (6). The Commissioner contends that the petitioner was organized and operated for the purpose, among others, of carrying on a large, competitive, commercial business for profit, and it does not come within the exempt class merely because its earnings inure solely to the benefit of another corporation which comes within the exempt class. The petitioner, citing *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578, says the test is not the source from which income is derived, but rather the destination of the income, and, therefore, exemption is not to be denied merely because its income is derived from a commercial or business activity which it conducts profitably. It is not satisfied to be called a "feeder" of an educational corporation, but claims that it falls squarely within the exempt class. It was organized and operated exclusively for educational purposes within the meaning of section 101 (6), it argues, since, as is conceded, it was carefully organized and operated so that no part of its earnings may ever inure to the benefit of any private stockholder or individual, but all must inure solely to the benefit of the law school through the university. The word "educational," as used herein, is to be understood to include any religious, charitable, scientific, literary, or educational purpose which might in any way relate to the petitioner because no point is made as to whether the purpose be of one kind or the other.

Perhaps it might be well to discuss first the question of whether this case is ruled by the *Sagrada* case. The conclusion has been reached that neither that case nor others like it are controlling here, because each of those cases dealt with a corporation itself engaged in carrying on some religious, charitable, or educational activity, whereas the petitioner is not engaged at all in that kind of work, but is engaged in carrying on a regular commercial business as its only activity; that is, it is auxiliary to an educational institution, but is

not itself such an institution. Such a marked factual difference requires a new and further examination of the intended scope of section 101 (6).

The *Sagrada* case was decided in 1924. The year involved was 1913, and section II, G of the revenue act of that year granted exemption to "any corporation or association organized and operated exclusively for religious, charitable, scientific, or educational purposes, no part of the net income of which inures to the benefit of any private stockholder or individual." The petitioner traces the statutory provision on which it relies back to section 38 of the Revenue Act of 1909, and even finds a counterpart in section 32 of the Revenue Act of 1894. It points out that the statutory language, so far as material hereto, has not been changed since the Revenue Act of 1913. The Court, in the *Sagrada* case, regarded as material "the fact that the limited trading, if it can be called such, is purely incidental to the pursuit of those purposes [of the religious order], and is in no sense a distinct or external venture." It pointed out that there was no selling to the public or in competition with others, or for the mere profits involved, but only for uses purely incidental to the religious, charitable, and educational work of the religious order. That case and *Unity School of Christianity*, 4 B. T. A. 61, *Sand Springs Home*, 6 B. T. A. 198, and others which followed it, are distinguishable from the present case because the petitioner in each of those cases was primarily engaged in carrying on religious, charitable, or educational activities and was held to have retained its exempt character even though it also carried on some profitable business. *Universal Oil Products Co.* v. *Campbell*, 181 Fed. (2d) 451.

The liberal test of the ultimate destination rather than the source of the income, developed in those cases, should not be stretched and distorted to cover a different type of corporation from the one with which the courts in those cases were dealing. Here, as already pointed out, the petitioner is not the corporation engaged in operating the educational institution, but is a wholly separate corporation which has as its sole day-to-day activity the operation of a macaroni business for profit. Such use of business corporations is relatively new, born principally of the necessity for colleges to obtain more income than the return theretofore received on their funds available for investment. Formerly, it was not the custom for educational and other similar institutions to risk their funds in carrying on a competitive business for the profit in it. It is not fair to assume that the judges, in deciding those earlier cases, had in mind corporations like the present petitioner or that they were careful to say what they said with the intention that it should apply also to corporations like the petitioner which might later come into extensive use. *Osaka Shosen Line* v. *United States*, 300 U. S. 98, 103.

Most of the other cases cited by the petitioner are distinguishable on the same ground, but a few of the more recent ones involved corporations somewhat like the petitioner. The court, in *Roche's Beach, Inc.* v. *Commissioner*, 96 Fed. (2d) 776, relied upon the *Sagrada, Unity School of Christianity*, and *Sand Springs Home* cases to hold that a corporation engaged in the operation of a bathing beach was exempt under section 101 (6), though not under section 101 (14). The court, in *Willingham* v. *Home Oil Mill*, 181 Fed. (2d) 9, held a somewhat similar corporation exempt "on the ground of equitable estoppel, on the authority of the *Trinidad* and *Roche's Beach* cases, and because of the reorganization and legal rebirth of appellee by the amendment of its charter." The opinion does not contain any helpful discussion of the general subject. The court, in the case of *Universal Oil Products Co.* v. *Campbell, supra,* held that the amendment of the certificate of incorporation of a corporation was insufficient to put it within the exempt class, where it had been organized originally as a profit corporation. That opinion discusses the subject extensively. Perhaps the present case is not distinguishable from the *Universal Oil Products Co.* case because here the old company was organized and operated for profit for many years and its purposes were continued through merger in the petitioner. The Commissioner's effort to distinguish the *Roche's Beach* case from the present one is not convincing, and if the two are not distinguishable, then, with all due respect, the Tax Court, not being convinced by the reasoning of the majority in the *Roche's Beach* case, declines to follow it at this time. This Court had held in that case that the corporation was not exempt. See 35 B. T. A. 1087. The Courts of Appeals in *Universal Oil Products Co.* v. *Campbell, supra,* and *Bear Gulch Water Co.* v. *Commissioner*, 116 Fed. (2d) 975, affirming 40 B. T. A. 1281; certiorari denied, 314 U. S. 652, contrary to the holding of the Court of Appeals for the Second Circuit in the *Roche's Beach* case, did not apply the rule that the destination of the funds rather than the source is controlling in the case of a corporation engaged in business whose earnings inure to the benefit of an exempt organization. Cf. *Underwriters' Laboratories, Inc.*, 46 B. T. A. 464; affd., 135 Fed. (2d) 371; certiorari denied, 320 U. S. 756; *Stanford University Book Store*, 29 B. T. A. 1280; affd., 83 Fed. (2d) 710; *Chattanooga Automobile Club*, 12 T. C. 967; *Smyth* v. *California State Automobile Association*, 175 Fed. (2d) 752.

Do the provisions of section 101 (6), when considered along with those of section 101 (14),* indicate that Congress intended to exempt

---

*SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this chapter—

\*  \*  \*  \*  \*  \*  \*

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the

a corporation like the petitioner, not itself engaged in educational activities, not merely holding property and collecting the income therefrom for an exempt educational institution, but actively engaged in operating a competitive, commercial business, in the operation of which it is entitled to deduct, and has actually deducted, social security taxes and, under section 23 (q) (2), charitable contributions? Congress, without comment in committee reports, included a new provision in section 11 (a), Twelfth, Revenue Act of 1916, exempting income received by any "Corporation or association organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this title." A similar provision now appears as section 101 (14) of the Internal Revenue Code. If the petitioner is right in its contention that it can engage actively in a big commercial business for profits and be exempt under section 101 (6) because its profits go to an exempt organization, then, *a fortiori*, any mere holding and collecting agent for a corporation exempt under 101 (6) likewise would be exempt under 101 (6) and, to that extent at least, there was no need for the new provision. A more logical interpretation of sections 101 (6) and (14) is that Congress therein exempted two different classes of corporations—those actually engaged in charitable or educational activities and those relatively inactive corporations which merely hold title to property, collect the income therefrom, and turn it over to a corporation of the exempt class. The present petitioner does not come within either of those classes. It is not and it does not claim to be a mere holding or collecting corporation, exempt under section 101 (14). *Gagne* v. *Hanover Water Works Co.*, 92 Fed. (2d) 659. The petitioner is no more within the class exempt under section 101 (6) than a holding and collecting corporation under section 101 (14) would be within any one of the classes of 101 for which it held and collected. A holding and collecting corporation would not be any one of the following merely because it held property and collected income exclusively for a labor union, a mutual bank or insurance company, a fraternal organization, a cemetery, a corporation organized and operated exclusively for educational purposes, a business league, a social club, or a farmers cooperative.

Congress had clearly in mind the difference between the various kinds of corporations. It intended to exempt some because of the

---

prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

*       *       *       *       *       *       *

(14) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this chapter.

*       *       *       *       *       *       *

main activity carried on and others because they merely held property and collected the income therefrom for an exempt corporation. It said nothing about a third class which enters actively into business to make money for an exempt corporation. The average person would easily distinguish that class from charitable and educational institutions because it is not engaged in charitable or educational activities. Congress intended to tax all commercial corporations competing with each other for business and profits and merely allowed them, in section 23 (q) (2), limited deductions for contributions made by them to charitable organizations.

Furthermore, the benefits to the public from the complete exemption of a corporation like this petitioner are not so apparent. That exemption could have a vicious effect upon nonexempt competitors because the exempt corporation, unlike the mere holding company, might be able to undersell its competitors as a result of the tax advantage and thus either drive them out of business or absorb them through its unlimited power to expand. The Court has concluded that Congress, in using the words "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes" in section 101 (6), meant only organizations actually and principally engaged in an activity of the kind mentioned, and did not mean to include in the exempt class another quite different class, the principal activity of which is engaging in a competitive commercial business for profit, although those profits are ultimately destined for a corporation in the exempt class. Cf. dissenting opinion of Judge Learned Hand in *Roche's Beach, Inc.* v. *Commissioner, supra.*

Even if section 101 (6) stood alone, it might fairly be interpreted as not including a corporation like the petitioner, since the important purpose of engaging in business for which it was organized and operated can not be disregarded. That purpose was not educational, and, therefore, the purposes for which it was organized and operated are not *exclusively* educational. Neither party refers to any helpful legislative history and the rulings of the Commissioner on the application of this section have not been consistent. It is possible that Congress did not have corporations like the petitioner in mind when it first enacted the exempting provisions. It has more recently had in mind this question, but, so far, has made no change in the law. Recitals in the articles of incorporation and in the agreement of merger that the petitioner was organized and was to be operated exclusively for charitable or educational purposes are not conclusive, *Universal Oil Products Co.* v. *Campbell, supra,* but consideration must be given also to the activities in which the petitioner was organized to engage and in which it actually engaged.

The old company was organized and operated exclusively to carry on a commercial business of manufacturing and selling macaroni at

a profit, and that corporation was not dissolved, but persisted, except for its corporate shell, in the petitioner through merger. Its purpose did not change through a change in ownership of stock, because a corporation is entirely separate from its stockholders. *National Carbide Corporation* v. *Commissioner*, 336 U. S. 442. One of the main purposes for which the petitioner was organized and operated was to continue to carry on that large, long established, commercial business. That was a vital purpose, a *sine qua non*, without which any other purpose would have been vacuous, since the petitioner could be of no benefit to the educational institution unless it carried on the macaroni business successfully. The incorporators of the petitioner had that purpose constantly in mind when they organized the petitioner, acquired all of the stock of the old company, merged the two corporations, and continued the operation through the corporate entity of the petitioner during the taxable period. It was never abandoned. The purpose to operate a macaroni business on the scale shown by the stipulation was concededly not an educational or charitable purpose, but was a nonexempting purpose which had subjected the old company to tax. Cf. Regulations 111, sec. 29.101 (6)–1. The educational purpose involved in the organization and operation of the petitioner derives solely from the use to which the earnings of the petitioner were to be put rather than from the operations of the petitioner in carrying on its business for profit. Exemption must be denied the petitioner unless its purely commercial everyday activities should be ignored in determining the possible application of section 101 (6) because there was the underlying purpose that the earnings of the petitioner were to be used exclusively to aid the law school.

"Exclusively" would rule out organizations whose operations, although in part charitable, nevertheless benefit to some degree individuals or organizations not coming within the broad definition of charity. *Better Business Bureau of Washington, D. C., Inc.* v. *United States*, 326 U. S. 279. But that limitation would not rule out the petitioner, since its earnings inured exclusively to the university. However, Congress, in section 101 (6), has not based the exemption solely on whether any part of the net earnings inure to the benefit of any private stockholder or individual, but has said that a corporation to be exempt must also have been "organized and operated exclusively" for the purposes mentioned. Cf. *Universal Oil Products Co.* v. *Campbell, supra;* Regulations 111, sec. 29.101 (6)–1. The word "exclusive," referring to something other than the use to which the earnings are to be put, limits the exemption to corporations with a singleness of purpose to carry on one or more of the charitable, educational, and other activities entitling it to exemption. The Court in the *Sagrada* case had this singleness of purpose in mind. One can not say properly that a corporation was organized and operated *exclusively* for educa-

tional purposes where, as here, one of its important purposes was to conduct a large commercial business for profit, competing with other similar corporations all subject to tax, and where the operation of that business is not merely incidental to the conduct by the same corporation of any other overshadowing exempting activity. The purpose to aid the educational institution, regardless of its relative importance, is not the exclusive purpose in the organization and operation of the petitioner.

It is the opinion of this Court, in the absence of any compelling authority to the contrary, that Congress recognized the generally understood difference between corporations like the petitioner and corporations like universities, hospitals, religious orders, and churches, and did not intend to include corporations like the petitioner in the class to be exempt under section 101 (6).

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

OPPER, *J.*, dissenting: The case of *Roche's Beach, Inc.* v. *Commissioner* (C. C. A., 2d Cir.), 96 Fed. (2d) 776, was decided in 1938. Since then, it has been cited favorably or actually relied upon by numerous courts in more than a dozen decisions.[1] In several other instances that also occurred in rulings of the Bureau of Internal Revenue, G. C. M. 20853, 1938–2 C. B. 166; G. C. M. 21610, 1939–2 C. B. 103, and G. C. M. 22116, 1940–2 C. B. 100.

The rule uniformly followed in the Tax Court is stated in *Estate of Louise V. Simpson*, 2 T. C. 963, 966:

> Respondent's argument has been answered in principle by the Second Circuit Court of Appeals in *Roche's Beach, Inc.* v. *Commissioner*, 96 Fed. (2d) 776, where the taxpayer was engaged in business with the general public but turned over its income to a charitable organization. * * *
>
> Until a recent date the Government accepted the rule laid down in the quoted case. It followed it in G. C. M. 20853, C. B. 1938–2, p. 166, holding that an association which held title to and operated a cemetery for the benefit of several religious organizations was itself entitled to exemption under section 101 (6) of the Revenue Act of 1936. Though the position has now been taken that *Roche's Beach, Inc.* v. *Commissioner*, supra, is no longer to be followed by the Bureau, G. C. M. 23063, C. B. 1942–1, p. 103, we have quoted it with approval, see *West Side Tennis Club*, 39 B. T. A. 149, 156; affd., 111 Fed. (2d) 6; certiorari denied, 311 U. S. 674; *American Society of Cinematographers, Inc.*, 42 B. T. A. 675, 680, and think it furnishes the proper answer to the case at bar.

---

[1] "The *Roche's Beach* decision has been followed, or the same principles declared, in the following cases: *Bohemian Gymnastic Association* v. *Higgins*, 147 Fed. (2d) 774, Second Circuit, decided March 8, 1945; *Debs Memorial Radio Fund* v. *Commissioner*, 148 Fed. (2d) 947, decided April 2, 1945, wherein the court said it would 'continue to do so until instructed otherwise by final authority'; *Commissioner* v. *Orton*, 173 Fed. (2d) 483, decided March 28, 1949, Sixth Circuit; *Home Oil Mill* v. *Willingham*, 68 Fed. Supp. 525, July 26, 1945, District Court, Alabama, of Fifth Circuit." (*Willingham* v. *Home Oil Mill* (C. A., 5th Cir.), 181 Fed. (2d) 9).

To paraphrase the language of the Second Circuit's opinion with respect to the instant facts, we can see no reason why Congress should wish to deny a deduction for a gift to a corporation operated exclusively to "feed" or serve an educational purpose when the deduction undoubtedly would be permissible if the corporation actually administered or "dispensed" the education. The Foundation meets all the other tests of the Code. No part of its earnings inures to the benefit of private shareholders or individuals, it is not engaged in propaganda or the influencing of legislation, and it was organized for educational purposes. We hold that it has also been operated exclusively for educational purposes.

Against this unbroken line of repeated and identical adjudications there is cited only the case of *Universal Oil Products Co.* v. *Campbell* (C. A., 7th Cir.), 181 Fed. (2d) 451, which is not and can not be relied upon for a contrary principle, but stands merely for the proposition, as the present opinion correctly states, that the test of the purposes of a corporation's organization appears from the circumstances of its original formation. And see *Underwriters' Laboratories* v. *Commissioner* (C. C. A., 7th Cir.), 135 Fed. (2d) 371; certiorari denied, 320 U. S. 756. Even if that be a correct statement of law, it has no application here, where petitioner was from the beginning organized as a corporation devoted exclusively to charitable purposes.

During this period the revenue act has been reenacted or reexamined by Congress on numerous occasions. As the court's opinion in this case recognizes, Congress "has more recently had in mind this question, but, so far, has made no change in the law." It seems to me that a judicial precedent so firmly imbedded in the history of legislation should be accorded more weight than is presently being given it.

It appears to be conceded that the *Roche's Beach* case is indistinguishable from the one now before us. The suggestion that the statutory scheme envisages exemption only under section 101 (14) is not new nor different from that made and discarded twelve years ago in the *Roche's Beach* case and since then in all the cases which have followed it.[2]

The nightmare of wholesale tax avoidance is an understandably difficult one for the tax collector to escape. But it seems to me that section 101, with the interpretative gloss placed upon it by judicial and administrative precedent, was intended to guard against the un-

---

[2] "* * * Subdivision 14 relates to corporations which hold title and collect income for any tax exempt organization, and such organizations include many which are not embraced within subdivision 6. Hence, the fact that subdivision 14, as we have construed it, does not include corporations which operate a business, should not lead to the conclusion that subdivision 6, which does refer to operating corporations, includes only those which directly dispense their funds for the limited purposes there stated. No reason is apparent to us why Congress should wish to deny exemption to a corporation organized and operated exclusively to feed a charitable purpose when it undoubtedly grants it if the corporation itself administers the charity. * * *" (*Roche's Beach, Inc.* v. *Commissioner, supra* 779). Cf. G. C. M. 19836, 1938–2 C. B. 163.

934

real charity, the masquerading educational institution, the qualified or conditional gift, and not, as here, a forthright financial transaction by a genuine and respected institution of learning. Cf. *Scholarship Endowment Foundation v. Nicholas* (C. C. A., 10th Cir.), 106 Fed. (2d) 552; certiorari denied, 308 U. S. 623; *Underwriters' Laboratories, Inc. v. Commissioner, supra; Edward Orton, Jr., Ceramic Foundation*, 9 T. C. 533; affd. (C. A., 6th Cir.), 173 Fed. (2d) 483; *Universal Oil Products Co. v. Campbell, supra; A. W. Mellon*, 36 B. T. A. 977, 1064.

Being of the view that any change in existing legislation is a matter for Congress and not for the Tax Court, I respectfully dissent.