Ralph H. Eaton Foundation v. Commissioner.
Ralph H. Eaton Found. v. Commissioner
Docket No. 30985.
United States Tax Court
1953 Tax Ct. Memo LEXIS 353; 12 T.C.M. (CCH) 210; T.C.M. (RIA) 53067; February 27, 1953
Martin H. Webster, Esq., 215 West Seventh Street, Los Angeles, Calif., for the petitioner. R. E. Maiden, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax liability and imposed delinquent filing penalties as follows: Tax Period
Deficiency
Penalty
3/12/47 to 1/31/48
$23,263.05
(25%) $5,815.76
2/ 1/48 to 1/31/49
1,223.88
(10%) 122.39
The questions presented are whether petitioner was an exempt charitable corporation within the meaning of section 101 (6), Internal Revenue Code, and whether petitioner had reasonable cause for failing to file timely income tax returns. Findings of Fact Some of the facts have been stipulated and are found accordingly. *354 Petitioner is a corporation organized under the laws of Arizona in March 1947. Its income tax returns for the periods in controversy were filed with the collector for the district of Arizona. Petitioner's incorporators were Ralph H. Eaton, Frances M. Eaton, his wife, and Thomas H. Kent, Jr. They were elected directors of petitioner and also president, vice president and secretary-treasurer, respectively, which positions they still held in May 1952. Petitioner has no capital stock outstanding and no subscriptions thereto. The Articles of Incorporation expressly prohibit the issuance of capital stock. Petitioner's Articles of Incorporation describe the nature and purpose of its proposed business as "To foster and promote Christian, religious, charitable and educational enterprises. * * *
"This corporation * * * does not contemplate pecuniary gain or profit to the members thereof * * *" The Articles also set forth a doctrinal statement describing the foundation upon which this corporation is based, as follows: "ARTICLE IV "The foundation upon which this corporation is based is a heart-conviction of the truth of the following DOCTRINAL STATEMENT: "1. We believe that *355 the entire Bible is the inspired and inerrant word of God, the only infallible rule of faith and practice. "2. We believe that the Lord Jesus Christ is the only begotten Son of God, conceived by the Holy Spirit and born of the Virgin Mary. "3. We believe in the literal, bodily, physical and premillennial return of Jesus Christ. "4. We believe in the sacrificial and vicarious death of the Lord Jesus Christ on the cross and that He thereby made perfect substitutionary atonement for the sin of the world. "5. We believe that all men are sinners and in an eternally lost condition apart from the saving grace of the Lord Jesus Christ. "6. We believe that acceptance into the family of God and eternal salvation can only be secured by believing in and by faith accepting and receiving the Lord Jesus Christ as personal Sin-bearer, Lord and Saviour." They direct that each director must reaffirm the doctrinal statement annually, in writing, and that the reaffirmance be filed with petitioner's permanent records. Failure, refusal or neglect to comply with this directive automatically divests the director of his office. The three directors did in fact reaffirm the doctrinal statement during *356 the periods in controversy. Ralph H. Eaton joined the Capital Christian Church of Phoenix, Arizona, in 1931. He became a member of the official board of the Church in about 1933. He is a life member of Gideons International. He is a director of the Arizona Bible Institute and the Phoenix Central High School, a member of the Layman's Advisory Council of the National Association of Evangelicals, and on the advisory boards of Christ for America, the American Soul Clinic and Bob Jones University of Greensville, South Carolina. In 1944, while attending an international convention of the Christian Business Men's Committee in New York City, Eaton heard a speech by an industrialist who had contributed money to charities and Christian work through his own charitable foundation. Thereafter, he read a book by the same individual which further described the part played by religion in his business pursuits. Eaton's principal source of income was the Eaton Fruit Company, a business owned by him and his two brothers. Kent had graduated from Butler University, and came to Phoenix in 1939. He went to work for the Eaton Fruit Company in 1941, and joined the Eaton-Heiskell Construction Company *357 in 1945 as bookkeeper. In January 1948 he became a salaried employee of petitioner. His duties were to act as office manager, bookkeeper and business manager, and to keep petitioner's minute book. Mr. and Mrs. Eaton had known Kent since about 1937. They had been members of the same church and of many religious and charitable organizations. Kent was not related to the Eatons. For about two years prior to March 1947, Kent and the Eatons discussed the formation of petitioner. Mrs. Eaton's interest in Christian work has always coincided with that of her husband. In or about February 1947, the Eatons and Kent consulted with Robert Weaver, a duly licensed attorney of Phoenix, Arizona, for the purpose of organizing petitioner. All details of the Articles of Incorporation except Article IV, the doctrinal statement, were left to Weaver for formulation. Article IV had been the subject of numerous deliberations among the incorporators for some time. In March 1947, Mr. and Mrs. Eaton transferred to petitioner, certain farm and office equipment in order to enable petitioner to engage in farming business operations. This equipment had been purchased within the previous six months at a total *358 cost of $1,843.66. The Eatons further transferred to petitioner at about that time all their right, title and interest in and to certain growing crops against which they had advanced to the date of transfer a sum of $3,520.79. Petitioner agreed to pay that sum to the Eatons. In the spring of 1945, Eaton purchased 110 acres of land on West McDowell Road in Phoenix, Arizona, and transferred that land to a corporate trustee pursuant to two trust agreements. This land was subdivided into lots, and one-tenth interest was sold to one George Heiskell at that time. In April 1947, the Eatons transferred to petitioner their remaining nine-tenths interest in the trusts, which was accepted by petitioner's board of directors on April 1, 1947. The net cost of the interest turned over by the Eatons to petitioner was $27,410.62. On January 1, 1948, Eaton further transferred to petitioner his partnership interest in Eaton & Heiskell Construction Company, a business engaged primarily in contracting the construction of small residences, which was accepted by petitioner's directors at a meeting held January 1, 1948. The total cost to the Eatons of transfers to petitioner during its first fiscal year aggregated *359 approximately $50,000. During the periods in controversy, petitioner was engaged in four different businesses: Farming, selling real estate, constructing small residences, and selling sport clothes. Petitioner's farming operations were conducted on land held under five leases. Under a lease dated March 20, 1947, petitioner leased from Eaton 80 acres of land known as the L AVENUE RANCH for one year beginning February 1, 1947, at a rental of $40 per acre per year. This lease was renewed for another year at its expiration at the same rental. The original rental and the renewal were authorized by petitioner's directors. Petitioner further leased land known as the SWANT RANCH from E. H. Swant for one year beginning July 1, 1947, at a rental of $30 per acre per year. On or about July 1, 1948, Eaton purchased the SWANT RANCH and entered into a new lease between himself and petitioner for one year beginning July 1, 1948, at a rental of $40 per acre per year. On or about April 1, 1948, Eaton purchased 40 acres of farm land on Ramona Road, Phoenix, Arizona and leased 35 acres thereof to petitioner for a period of one year beginning April 1, 1948, at a rental of $40 per acre per year. Petitioner *360 also leased from one Lovell T. Rousseau a ranch known as the ROUSSEAU RANCH for a term of approximately six months beginning July 1, 1948, and at a rental of $60 per acre per year. Petitioner leased a certain ranch known as the MANN RANCH from T. A. Mann for a term of one year beginning August 1, 1947, at a rental of $35 per acre per year. This lease was renewed at its expiration for an additional six months, at a rental rate of $45 per acre per year. All of these leases and their renewals were authorized by petitioner's board of directors. Petitioner's farming operations were managed by one L. E. Eastes pursuant to a contract entered into with petitioner for one year beginning February 1, 1947, and subsequently extended for one year. Eastes is not related in any way to the Eatons or Kent, nor does he own any legal or beneficial interest in petitioner. Neither Mann, Swant nor Rousseau are related to Kent or the Eatons, nor do they have any interest in petitioner. Petitioner's net income from its farming operations during the periods in controversy was as follows: 3/12/47 to 1/31/48
$16,731.14
2/ 1/48 to 1/31/49
7,095.23
The L AVENUE RANCH was formerly leased *361 by Eaton to the Eaton Fruit Company at the same rental later paid by petitioner. Eaton charged petitioner for the rental of his lands because of financial necessity. He had purchased the SWANT RANCH and Ramona land on an installment basis, and his combined payments per year, including amortization of principal on these properties were more than three times the rental he received from petitioner. He also expended substantial sums in improving these properties. Petitioner's subdivision operations consisted of selling the subdivided lots contained in the land which had been subjected to trust agreements. Petitioner's net income from these operations for the periods in controversy was as follows: 3/1/47 to 1/31/48
$49,089.41
2/1/48 to 1/31/49
2,784.06
In or about November 1945, Eaton entered into a partnership with George M. Heiskell under the name of Eaton & Heiskell Construction Company, to engage in general contracting. In January 1948, petitioner purchased Heiskell's interest in the company for its book value. Simultaneously Eaton donated his interest in the company to petitioner. Petitioner has operated the business under its original name since that time. *362 Heiskell was employed to manage the business for petitioner under a written contract, the terms of which provided for one year of employment beginning January 1, 1948. The term was extended in fact for an additional month, to January 31, 1949. Heiskell is not related to the Eatons or to Kent. Petitioner derived the following net income from its construction operations during the periods in controversy: 3/12/47 to 1/31/48
(none)
2/ 1/48 to 1/31/49
$7,551.52
On June 2, 1947, pursuant to authorization of its directors, petitioner acquired the distributorship within the State of Arizona of certain sport clothes manufactured by one C. F. Smith. Petitioner operated this business under the name of "Hollywood Sportogs of Arizona," and was to receive 10 per cent of all gross sales. This business activity was discontinued on June 1, 1948, due to management difficulties and lack of sales. Petitioner incurred net losses from this business during the periods in controversy as follows: 3/12/47 to 1/31/48
($533.83)
2/ 1/48 to 1/31/49
( 134.39)
Petitioner's directors discussed its business activities fully before undertaking each of them, and were completely *363 agreed on petitioner's course of action in all cases. At a meeting of the directors on May 1, 1947, petitioner adopted a list of 26 named beneficiaries engaged in charitable or religious work to whom its funds would be made available, in its discretion. It also provided for contributions of not more than $10 by petitioner's president to miscellaneous organizations engaged in charitable and religious work, without necessity for consulting the Board. At a Board meeting held on January 1, 1949, seven additional named beneficiaries were added to petitioner's list. This list was compiled after a thorough investigation of the activities of each organization. Petitioner kept a file on each. All beneficiaries had to be and are engaged in activities which carried out the purposes and ideas for which petitioner was established. None of them is engaged in the carrying on of propaganda or in efforts to influence legislation. None of them has any private, beneficial or personal interest in petitioner. No beneficiaries are individuals; any names of individuals on petitioner's list appear as representatives of an organization. During the periods in controversy, petitioner made contributions to *364 beneficiaries as follows: 3/12/47 to 1/31/48
$4,240
2/ 1/48 to 1/31/49
2,310 In addition to monetary contributions, petitioner rendered consultative services to some beneficiaries. Petitioner's officers assisted in planning two church building programs. Except for rental payments, interest on money borrowed, payment for costs advanced by Eaton on certain equipment and growing crops, and repayment of loans, petitioner paid nothing of tangible value to Eaton or to his family during the instant taxable years. Eaton rendered substantial services to petitioner. The only compensation received by Kent is a weekly salary of $100, paid since January 1, 1948, when he began devoting his full time to petitioner's affairs. He has rendered substantial services to petitioner. Petitioner relied for its tax information on a firm of certified public accountants and tax consultants which enjoyed an excellent reputation in the field of income taxation among prominent business men in the Phoenix community. The Phoenix manager of this firm advised petitioner that it was an exempt corporation and did not have to file Federal income tax returns. Petitioner filed an application for exemption *365 signed by Ralph H. Eaton, president, under section 101 (6) of the Internal Revenue Code on or about June 14, 1948, on the advice of these tax consultants. On April 8, 1949, petitioner was advised that its claim for exemption had been denied. On May 9, 1949, petitioner filed a protest to the Commissioner's finding. Upon learning that petitioner's exemption claim had been rejected, petitioner's tax consultants advised it to file Federal income tax returns for the periods in controversy, which petitioner did on May 13, 1949. Petitioner's failure to file timely Federal tax returns for the periods in controversy was due to reasonable cause and not to willful neglect. Opinion The claim of petitioner, a corporation conducting exclusively business operations, for exemption under section 101 (6), Internal Revenue Code, [1] as a "feeder" corporation of unmistakably exempt religious organizations must be rejected because "The Tax Court has * * * indicated that it had not changed its thinking on this point despite a reversal by the Court of Appeals for the Third Circuit * * *. Cf. C. F. Mueller Co., 14 T.C. 922, revd. 190 Fed. (2d) 120 *366 * * *." John Danz, 18 T.C. 454, 461. On this point petitioner candidly concedes that after the Mueller decision "* * * the Tax Court has consistently held in line with the Mueller decision, despite the reversal of the latter by the 3rd Circuit." It also correctly analyzes the conflict among the various Circuits on this point, [2] resolution of which by the Supreme Court, whether or not likely in view of the modification of section 101 (6) contained in the Revenue Act of 1950, [3] has not yet taken place. *367 The only discussion in the Court of Appeals for the Ninth Circuit to which we have been referred, Squire v. Students Book Corp., 191 Fed. (2d) 1018, is actually noncommittal on the present facts, as witnessed by the following language in that opinion: "Resolution of the case before us does not depend wholly on the ultimate destination of the taxpayer's profits. The business enterprise in which taxpayer is engaged obviously bears a close and intimate relationship to the functioning of the College itself. In some of the cases adhering to the general rule no similar relationship is discernible. In the Mueller case, supra, for example, * * * the taxpayer was a mere macaroni manufacturing plant in competition with other such plants." See Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578. We accordingly pass other difficult questions lurking in the present record, such as the fact that petitioner operated property rented to it by its founder and guide, Ralph Eaton, who with his wife constituted two-thirds of petitioner's board of directors; its failure to distribute more than a small fraction of its own operating income even to the beneficiary religious *368 organizations; [4] and to borrow the language of petitioner's brief: "* * * the admitted absence of an express prohibition in the Articles against the return of assets to petitioner's founders on dissolution." See Norton et al. v. Steinfeld et al., (Ariz.), 288 P. 3, 6; 16 Fletcher on "Corporations", 878. Whether under such circumstances petitioner could in any event qualify as an organization operated "exclusively" for religious purposes "no part of the net earnings of which inures to the benefit of any private shareholder or individual" we need not now decide. For the reason stated, the deficiency in this respect is approved.
As to the penalty issue, the doubtful state of the law clearly justified petitioner's resort to qualified tax counsel. It was upon his advice that an application for exemption rather than a tax return was filed. We think under the circumstances there has been a showing of *369 reasonable cause rather than willful neglect. See William H. Gross, 7 T.C. 837, 848. Decision will be entered under Rule 50. Footnotes
1. "SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. "The following organizations shall be exempt from taxation under this chapter - "(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;" ↩
2. Again quoting from petitioner's brief: "To attempt to reconcile the viewpoint of the majority of courts that destination controls over source with the current viewpoint of the Tax Court and the two 'dissenting' circuits (the 4th and the 7th) would seem to be an impossible task." ↩
3. Revenue Act of 1950, section 331.↩
4. ↩
Contributions
Allowed as De-
Total Adjusted
Contributions
ductions (5% of
Year
Operating Income
Actually Made
Net Income)
3/12/47 to 1/31/48
$65,510.49
$4,240.00
$3,222.03
2/ 1/48 to 1/31/49
17,633.92
2,310.00
302.95