PAUL G. BOMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54689.    Filed June 22, 1956.

*John W. Hughes, Esq.*, for the petitioner.
*Stanley W. Ozark, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined deficiencies in the petitioner's income tax, as follows:

| | |
|---|---|
| 1946 | $1,534.83 |
| 1947 | 396.61 |
| 1948 | 1,220.24 |
| 1949 | 235.16 |

The only issue is whether the Commissioner erred in holding that the petitioner's alleged contributions to the Duluth Clinic Foundation (hereafter called Foundation) during the taxable years are not deductible under section 23 (o) of the Internal Revenue Code of 1939.

All facts were stipulated and the stipulations are adopted as findings of fact.

The petitioner is an individual who filed his returns for the periods here involved with the collector of internal revenue for the district of Minnesota.

The petitioner is and was during the taxable years a member of the Duluth Clinic, hereinafter referred to as Clinic. It is a partnership of 23 doctors and 7 associated physicians engaged in medical practice in Duluth, Minnesota, and the adjacent area. Clinic owns no physical assets.

The then members of Clinic organized Octagon Investment Company, hereinafter referred to as Octagon, and in 1926, the 5 members subscribed for 175 shares of $100-par-value Octagon stock. Octagon constructed a building to house Clinic and gave the First National Bank of Duluth, Minnesota, a $165,000 first mortgage on the property. The mortgage provided, as the bank required, that the building was to be leased to Clinic. Additional financing for the building was obtained through sales of additional shares of Octagon stock, until in 1929, 1,305 shares of Octagon stock were outstanding. Notes of Octagon were exchanged in 1932 for 90 per cent of its stock then outstanding, which shares of Octagon stock were then retired, in order to insure the continued ownership of Octagon stock by members of Clinic. The remaining 10 per cent of Octagon stock was retained by 3 members of Clinic acting as trustees for the entire membership.

Foundation was incorporated on July 18, 1945, under the laws of the State of Minnesota. Its certificate of incorporation provided, *inter alia:*

2. This corporation is organized and shall be operated exclusively for charitable, scientific and educational purposes, including, among other things, the aid of the sick and disabled, the study of the causes, characteristics, prevention and cure of human ailments and injuries, and problems of general public hygiene and health, and the promotion of medical, surgical and scientific research, knowledge, skill and education.

3. Its plan of operation shall be to receive, by purchase, gift, devise, bequest or otherwise, either from its members or others, real or personal property of any nature; to hold, use, improve, operate, manage, lease, sell, convey, pledge, mortgage, invest and dispose of any such property, to borrow money for the improvement of any such property, and to place mortgages thereon to secure any debt so incurred. All net income from any such property, and all the proceeds of any disposition thereof, and all its net earnings and income shall be used exclusively for the promotion of its charitable, scientific and educational purposes. The corporation may do and perform generally and anywhere any and all acts and things reasonably incident to its said purposes; provided that no part of the activities of the corporation shall ever be the carrying on of propaganda or otherwise attempting to influence legislation, or the practice of medicine or surgery. No part of the property, net earnings or net income of this corporation shall ever inure to the benefit of any private shareholder, member or individual.

\*      \*      \*      \*      \*      \*      \*

5. This corporation shall have no capital stock. The undersigned incorporators shall constitute the original members thereof. Additional persons may be admitted to membership upon application approved by resolution of the board of directors. The amount of yearly contributions required of members shall be such amount, not exceeding $1.00 per year, as may be determined from time to time by the directors. The membership of any member or members may be terminated with or without cause by resignation filed with the secretary, or by resolution adopted by the affirmative votes of at least three-fourths of the board of directors.

\*      \*      \*      \*      \*      \*      \*

9. This corporation shall have perpetual succession, but in the event of the dissolution or other termination of the corporation, all of the assets thereof shall, after the payment of its obligations, be conveyed, paid over and delivered to such non-profit institution for medical education or research as may be designated by resolution of the directors, and in default of such resolution, then to the University of Minnesota for the use and benefit of its College of Medicine.

The petitioner was mentioned in the certificate of incorporation as vice president, a member of the board of directors, and an incorporator.

Foundation was and remains under the control of Clinic, all directors, officers, and members of Foundation being members of Clinic. Foundation for the first time and at the Commissioner's request filed the application specified by Regulations 111, section 29.101-2, for exemption under the provisions of section 101 (6) of the Internal Revenue Code of 1939 in September 1949. The Commissioner issued a ruling on July 3, 1953, to Foundation that it was not exempt under the provisions of section 101 (6).

Clinic transferred to Foundation prior to September 15, 1945, all the furniture, fixtures, instruments, and other tangible property,

owned and used by Clinic in the practice of medicine and surgery. Foundation leased that property to Clinic on September 15, 1945. The lease was made on a year-to-year basis, renewable for 10 years, and provided for an annual rental of 16 per cent of the cost or fair market value, whichever might be greater, of the rental properties.

Octagon executed on December 1, 1945, an irrevocable lease of the building housing Clinic to Clinic for a term of 15 years. The lease incorporated the conditions on which the mortgage on the building was obtained, and further provided that Clinic pay $2,600 per month as rent, provided, however, that such monthly rental could from time to time be reduced by agreement between Foundation and Clinic, but not to amount to less than the sum required to permit Foundation to pay the semiannual installments of $4,125 on the mortgage debt, plus interest thereon, operating expenses, and taxes. This lease is still in effect, and Clinic continues to occupy the building thereunder. It has paid rent for the building at the $2,600 per month rate in all years through 1952.

The outstanding stock of Octagon was transferred in 1946 by the 3 trustees to Foundation. Octagon conveyed the title to the land and building housing Clinic to Foundation on December 27, 1947, and Foundation assumed the first mortgage on which the balance then outstanding was $148,500. Foundation also assumed liability on the notes of Octagon held by the members of Clinic in the amount of $104,500.

The following table shows the gifts received by Foundation, the portion thereof given by Clinic, the petitioner's share of the latter, and the total charitable contributions by Foundation, for the years shown:

| Year | Cash and bonds | Radium | Pharmacy and clinic fixtures | Octagon Investment Co. stock | Total | Clinic's share | Petitioner's share | Foundation's charitable contributions |
|------|------|------|------|------|------|------|------|------|
| 1945 | $16,969.21 | $2,771.39 | $53,755.29 | ---------- | $73,495.89 | $73,495.89 | ---------- | ---------- |
| 1946 | 8,425.00 | ---------- | ---------- | $53,543.09 | 61,968.09 | 61,943.09 | $3,656.80 | $975 |
| 1947 | 14,418.97 | ---------- | ---------- | ---------- | 14,418.97 | 12,000.00 | 707.94 | 7,075 |
| 1948 | 31,329.00 | ---------- | ---------- | ---------- | 31,329.00 | 31,000.00 | 2,252.93 | 7,325 |
| 1949 | 6,855.00 | ---------- | ---------- | ---------- | 6,855.00 | 6,760.00 | 452.91 | 7,000 |
| | $77,997.18 | $2,771.39 | $53,755.29 | $53,543.09 | $188,066.95 | $185,198.98 | $7,070.58 | $22,375 |

The total itemized contributions shown by the petitioner on his 1946 return exceeded 15 per cent of adjusted gross income and the petitioner claimed only $3,713.63 as "contributions" for that year. The amount disallowed for 1946 in the statutory notice of deficiency was $3,025.73.

Foundation's income and expenses for the years 1945 through 1949 were as follows:

| | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|
| **Income:** | | | | | |
| Rental income from Clinic: | | | | | |
|   Fixture rental | $1,525.88 | $10,276.38 | $11,921.99 | $17,831.71 | $20,349.35 |
|   Building | | | | 31,200.00 | 31,400.00 |
| Other rental income: | | | | | |
|   201 W. 3d St | | | | | 379.32 |
| Interest (investments) | 11.79 | 44.25 | 29.82 | 65.13 | 52.15 |
| Membership dues | 19.00 | 19.00 | 21.00 | 51.00 | 29.00 |
|     Total income | $1,556.67 | $10,339.63 | $11,972.81 | $49,147.84 | $52,209.82 |
| **Expenses:** | | | | | |
| Insurance premiums paid | $171.42 | $76.85 | $88.33 | $573.56 | $702.74 |
| Interest paid | | | | 12,127.50 | 11,797.50 |
| Depreciation | 1,354.89 | 5,999.18 | 8,665.75 | 21,090.25 | 22,449.19 |
| Taxes—personal property | | 753.97 | 795.34 | 1,229.44 | 1,233.66 |
| Taxes—real estate | | | | 7,556.04 | 10,349.74 |
| Office supplies | 10.02 | | | | |
| Maintenance expense | | | | 84.65 | 42.18 |
| Legal expense | | | | 1,572.81 | 705.75 |
| Research projects | | | | | 221.36 |
| Sundry | | | | | 146.90 |
|     Total expenses | $1,536.33 | $6,830.00 | $9,549.42 | $44,234.25 | $47,649.02 |
| Sundry credit—income | | | | $421.13 | |
| Net income before deduction for contributions to charitable and educational purposes | $20.34 | $3,509.63 | $2,423.39 | $5,334.72 | $4,560.80 |

No part of the activities of Foundation during the years 1945 through 1949 consisted of carrying on any propaganda or otherwise attempting to influence legislation.

Foundation acquired in 1948 and 1949 two lots across the alley north of the main building housing Clinic, which lots were converted into parking space for patients of Clinic. The first lot was purchased on December 2, 1948, at a total cost of $12,096.55; the second on April 28, 1949, at a total cost of $6,985.70. The lots were used as parking space starting September 1, 1949. Clinic paid Foundation $200 as rent for the last 4 months of 1949 for the 2 lots. The rental was retroactively adjusted in March 1956 to approximate 9 per cent of the cost, and Clinic accordingly paid $371.56 as additional rent for the 2 lots for the last 4 months of 1949.

The activities of Foundation during the taxable years consisted of managing the building and equipment, receiving the rent and the contributions and paying the contributions made by it, improving its property and acquiring property to the extent above stated, and making payments on the mortgage debt and notes owed by it.

Foundation expended $8,393.88 in 1951 for the installation of air conditioning equipment on 2 floors of the building housing Clinic. Foundation expended in 1950 and 1951 $44,667.93 for new furniture and fixtures for Clinic and $16,500 to reduce the mortgage on the building housing Clinic. Foundation disbursed during the same period $763.75 for research projects, $1,172.95 for visiting lectureships, and $700 for miscellaneous contributions.

The provisions of the charter of Foundation are quite adequate for a charitable corporation but they alone are not determinative of the

issue here. *Cummins-Collins Foundation*, 15 T. C. 613; *Ohio Furnace Co.*, 25 T. C. 179, 188. Clinic, a partnership composed of practicing physicians, organized Foundation, transferred its operating equipment to Foundation, and had a wholly controlled corporation transfer a building to Foundation. Clinic had to have the use of the building and the equipment in order to carry on its operations for profit and, after giving the property to Foundation, it obtained that use by leasing the building and equipment from Foundation. The holding, maintaining, and leasing of those properties for the sole benefit of Clinic would, standing alone, be convincing evidence that Foundation was not organized and operated exclusively for charitable purposes within the meaning of section 23 (o) (2) or section 101 (6), regardless of its charter provisions. Cf. *Lesavoy Foundation*, 25 T. C. 924; *Amy Hutchinson Crellin*, 46 B. T. A. 1152. The charging of lower rent than adverse parties would agree upon would be additional evidence of the same sort. However, the Commissioner does not contend that the rent for the equipment or the original rent for the building were inadequate but he calls attention, as some evidence of intent, to the inadequate rent charged for the use of the parking areas late in 1949 and to the fact that no additional rent was charged in later years for the air conditioning, installed at substantial cost.

The principal activity of Foundation during the taxable years was the holding, maintaining, managing, and renting of the building, the parking lots, and the equipment needed by the physicians composing Clinic which controlled Foundation. That activity is not one which leads to exemption from tax of the income derived from that business. Cf. *C. F. Mueller Co.*, 14 T. C. 922, revd. (C. A. 3) 190 F. 2d 120. The charitable activities of Foundation could change the picture, if they were the dominant and main purpose of the corporation during the taxable years. The Commissioner concedes that Foundation distributed $22,375 to qualified charities during the taxable years, $975 in 1946 and about $7,000 in each of the next 3 years, $17,500 of which was to a hospital's building fund. Those contributions did not depend upon earnings of Foundation since the latter were inadequate for the purpose. They were made possible by contributions which Clinic made to Foundation. Clinic contributed to Foundation during the period 1945 through 1949 a total of $185,198.98 in cash and other property. Foundation retained most of that total for the expansion and conduct of its business, essential to the business of Clinic. The equipment account more than doubled from 1945 through 1949 and the land account also increased. The charitable aspect of contributions to Foundation to enable it to provide the facilities and equipment essential to the operation of the donor, Clinic, is not readily apparent. The amount distributed by Foundation to recognized

charities was only a small part of its gifts from Clinic plus its meager earnings. The deductions claimed by the petitioner are his proportionate part of the total gifts made by Clinic to Foundation.

The stipulated facts, as a whole, rather indicate that Foundation, in its only charitable operation during these years, was merely a conduit for passing on to charities the contributions which the partners, Clinic, chose to make. Gifts to a conduit could represent deductible contributions by the donors if it appeared that the principal purpose and activity of the conduit was the distribution of its funds to recognized charities but the petitioner has failed to show that this is such a case. Those limited. acts do not color the larger operations of Foundation with an exclusively charitable hue. Here, Foundation, engaged primarily in a regular commercial business on behalf of Clinic, is not made tax exempt merely because it distributed to charities relatively small amounts derived from small earnings and large gifts made by the physicians whom it served; at least the evidence does not justify reversal of the Commissioner's determination disallowing the deductions claimed.

The petitioner does not claim the right to deduct an aliquot part of the charitable distributions made by Foundation and the Court does not consider any such question.:

*Decision will be entered for the respondent.*