OHIO FURNACE COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SHATTUCK-OHIO FOUNDATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 29531, 37057, 47330. Filed October 31, 1955.

*Robert J. Johnson, Esq.*, for the petitioners.
*Thomas A. Steele, Jr., Esq.*, for the respondent.

186

OPINION.

Turner, *Judge:* Petitioner Shattuck-Ohio Foundation contends that it is entitled to exemption under both section 101 (6) and 101 (14) of the Internal Revenue Code of 1939,[1] and, alternatively, that if it is not exempt under these sections of the Code, it is then exempt under the provisions of section 302 (d) of the Revenue Act of 1950.[2]

To qualify for exemption under section 101 (6), the Foundation must satisfy three conditions. First, it must have been organized and, during the years herein, must have been operated exclusively for educational purposes. Second, no part of its earnings may have inured to the benefit of any private shareholder or individual. And third, no substantial part of its activities may have been the carrying on of propaganda or otherwise attempting to influence legislation.

The parties are in agreement that the Foundation did not indulge in the carrying on of propaganda or otherwise attempting to influence legislation. It is clear also that it was organized exclusively for educational purposes. The specific purpose of its organization, as shown by the evidence, was to give financial assistance to the Shattuck School,

---

[1] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.
The following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \* \* \*

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

\* \* \* \* \* \* \*

(14) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this chapter;

[2] SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS.
(d) PROFITS INURING TO THE BENEFIT OF CERTAIN EDUCATIONAL ORGANIZATIONS OR HOSPITALS.—For any taxable year beginning prior to January 1, 1951, an organization operated for the primary purpose of carrying on a trade or business for profit, no part of the net earnings of which inures to the benefit of any private shareholder or individual and all of the net earnings of which inure to the benefit of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activities are regularly carried on, or to the benefit of a hospital, or an institution for the rehabilitation of physically handicapped persons, which maintains or is building for proper maintenance a hospital or institution staffed or to be staffed by qualified professional persons for the treatment of the sick and/or the rehabilitation of the physically handicapped, shall not be denied exemption from taxation under section 101 of the Internal Revenue Code on the ground that it is carrying on a trade or business for profit. The determination as to whether an organization other than one described in this subsection is exempt under section 101 of the Internal Revenue Code from taxation for any taxable year beginning before January 1, 1951, shall be made as if this subsection and section 301 (b) of this Act had not been enacted and without inferences drawn from the fact that this subsection and the amendment made by section 301 (b) are not expressly made applicable with respect to taxable years beginning before January 1, 1951.

and though the assistance to be given, according to its charter, is not limited to the Shattuck School, any other organizations which may be benefited must be nonprofit corporations organized under the laws of the State of Minnesota for educational purposes and which are engaged in the same activities as the Shattuck School, namely, in the conduct of schools of learning for the education of boys below the college or university level.

It is the contention of the respondent that the Foundation was not operated exclusively for educational purposes during the years herein, since in those years it made no distributions of income for educational purposes, as stated, but used substantially all of its income in making payments to the sellers of the Furnace Company stock in satisfaction of notes of the Foundation held by those sellers. He takes the further position that by reason of the payments of substantially all of the income of the Foundation to the sellers of the stock, the net earnings of the Foundation did inure to the benefit of private individuals, contrary to the requirement of the statute.

There can be no question, we think, that the last contention stated is not well taken. Respondent makes no point that the trustees of the Shattuck School in organizing the Foundation did not do so in good faith or that the transactions and negotiations in the purchasing of the Furnace Company stock were not at arm's length. Moreover, the price paid for the stock in our opinion appears to have been reasonable, and the respondent does not contend otherwise. In acquiring the stock of the Furnace Company the Foundation was making an investment which under its charter could be used for no other purpose than the benefit of educational institutions in the State of Minnesota, and more particularly nonprofit corporations organized under the laws of that State for educational purposes and engaged in conducting schools of learning for the education of boys below the college or university level. Inasmuch as the investment in the Furnace Company stock was a sound investment and the price was fair, the payments from the Foundation's income to the sellers of the Furnace Company stock did not constitute an inurement of the Foundation's income to them but was the consideration in a purchase of stock for value received.

Remaining is the question whether the use by the Foundation of substantially all of its income for making the investment in Furnace Company stock, as contrasted with immediate and direct application thereof to the Shattuck School or other comparable schools, makes the operation of the Foundation other than an operation exclusively for educational purposes within the meaning of section 101 (6). The only reference in the statute bearing specifically upon the use of income is the prohibition that no part of the net earnings of the corporation, fund, or foundation may inure to the benefit of any private share-

holder or individual. Conversely, it is reasonable to conclude, we think, that the requirements of 101 (6) are satisfied if all of the income inures to the benefit of, or is in promotion of, an operation which is exclusively educational. Certainly there is no requirement that the income must either be used or distributed in the year realized for the described purpose, and we know of no case wherein a corporation, fund, or foundation was denied exempt status merely because it accumulated its income for distribution in a succeeding or later year. See *Alan Levin Foundation*, 24 T. C. 15. On the record here it may be said, we think, that there is no present intention that any of the income invested in the Furnace Company stock will ever be applied directly to school operations, but, on the other hand, it does appear that the fruits of the investment must be used exclusively for the prescribed purposes. In short, the facts show with certainty that all of the income of the Foundation, including that which is being invested in the Furnace Company stock must inure solely and exclusively to the benefit of the Shattuck School or some other Minnesota nonprofit organization organized and operated exclusively for educational purposes. Such being the case, it follows, we think, that the use of the income of the Foundation in the purchase of the Furnace Company stock was the use thereof solely and exclusively for the educational purposes for which the foundation was organized. Compare *Alan Levin Foundation, supra.* See also *Arthur Jordan Foundation* v. *Commissioner*, 210 F. 2d 885. We accordingly hold that the Shattuck-Ohio Foundation was organized and operated exclusively for educational purposes within the meaning of section 101 (6).

Petitioner Ohio Furnace Company, Inc., likewise, claims exemption from Federal income tax under section 101 (6) of the Code and section 302 (d) of the Revenue Act of 1950. The Furnace Company during the years in issue was operating a company engaged in the trade or business of the sale and distribution of heating and lighting machinery, facilities, appliances, and equipment. All of the stock of the Furnace Company was owned by the Foundation and during the years here in question the entire net earnings of the Furnace Company were distributed in dividends to the Foundation or retained by the corporation for its current needs. Petitioner contends that inasmuch as it was organized and operated exclusively as a "feeder" corporation for the Foundation, that no part of its net earnings inured to the benefit of any private shareholder or individual, and that all the years involved are prior to 1951, it is an exempt corporation under the principle of *Roche's Beach, Inc.* v. *Commissioner*, 96 F. 2d 776; *C. F. Mueller Co.* v. *Commissioner*, 190 F. 2d 120; *Jack Little Foundation* v. *Jones*, 102 F. Supp. 326; *Sico Co.* v. *United States*, 102 F. Supp. 197; *Home Oil Mill* v. *Willingham*, 68 F. Supp. 525; and *Willingham* v. *Home Oil Mill*, 181 F. 2d 9. Petitioner recognizes the conflicting re-

sults reached by the circuit courts in the *Mueller* case and in *United States* v. *Community Services, Inc.*, 189 F. 2d 421, as well as the consideration given the question herein involved by this Court in reaching its decision in the *Mueller* case at 14 T. C. 922, and in its subsequent decisions in *Joseph B. Eastman Corporation*, 16 T. C. 1502, and *Donor Realty Corporation*, 17 T. C. 899. Petitioner does not attempt to distinguish the factual situation here involved with that of the *Mueller* and *Eastman* cases, but on the contrary, charts, on brief, the factual similarities between those cases and the present one. Such being the state of the record, we adhere to our views as set forth in the *Mueller*, *Eastman*, and *Donor Realty* cases.

It does not follow, however, that the Furnace Company is not exempt for the years herein under applicable law as now constituted. Section 301 (b) of the Revenue Act of 1950 added a provision to section 101 of the Internal Revenue Code of 1939, which in substance states that no business corporation operated for profit shall be exempt from tax even though all of its profits are payable to exempt organizations. This amendment is made applicable only to taxable years commencing after December 31, 1950. By section 601 of the Revenue Act of 1951, Congress added subsection (d) to section 302 of the Revenue Act of 1950. The specific language of subsection (d) provides, *inter alia*, that an organization shall not be denied exemption from taxation under section 101 on the ground that it is carrying on a trade or business for profit when "all of the net earnings * * * inure to the benefit of an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils or students in attendance at the place where its educational activities are regularly carried on." As to organizations other than the one just described, it is provided that section 101 is to be construed and applied as if section 302 (d) had not been enacted. Accordingly, the question for decision is whether the net earnings of the Furnace Company inured to the benefit of an educational organization described by section 302 (d). It is petitioner's argument that inasmuch as it was the intention of all of the parties involved in purchasing the Furnace Company and in organizing the Foundation that the Shattuck School should be the sole recipient and beneficiary of the net earnings of the Furnace Company and the Shattuck School fits the definition of section 302 (d), the Furnace Company is therefore exempt. In the alternative, petitioner contends that even if the broader language of the Foundation charter is used, the earnings will nevertheless inure to institutions which fall within the described organizations in section 302 (d). Respondent, on the other hand, contends that the petitioner fails to qualify inasmuch as the earnings of the Furnace Company are not distributable nor were they distributed to any educational organization. He argues that in no light can the Founda-

tion, which was the sole recipient of the Furnace Company's earnings, be viewed as an educational organization within the meaning of section 302 (d).

While it is true that the Foundation does not qualify as an educational organization within the meaning of section 302 (d), that section does not provide that all the net earnings must be paid directly to the type of educational organization set forth in that section, but that they "inure" to the benefit of such an educational organization. Thus, if the Foundation, which received all the net earnings of the Furnace Company, were to distribute the dividends received by it from that corporation to educational organizations which qualify under section 302 (d), or otherwise use the income for the exclusive benefit of such organizations, the earnings of the Furnace Company would inure to the benefit of educational institutions under that section the same as they would if they had been distributed directly. Under the charter, the only permitted distributees of Foundation income or principal are "nonprofit corporations organized under the laws of the State of Minnesota for educational purposes, and in particular to such corporations which may be engaged in conducting schools of learning for the education of boys below the college or university level." Such grants are to be used to provide adequate and competently trained faculties and administrators; to provide for the improvement of teaching; to furnish aid and assistance, in the form of grants in aid, for buildings, research, instruction, equipment, and all other facilities for secondary education; to provide funds for vocational guidance of students at such institutions; and, generally, to aid and assist the cause of secondary education in private schools for boys in the State of Minnesota, provided that corporations conducting such schools are nonprofit educational institutions organized under the laws of Minnesota. No part of the properties or income of the Foundation is ever to be used or employed directly or indirectly for the purpose of carrying on propaganda or otherwise attempting to influence legislation, nor is any gift or grant to be made by the Foundation to any other corporation unless the recipient thereof by the terms of the gift or grant, or by its charter, is prohibited from using such grant for the purpose of carrying on propaganda or otherwise attempting to influence legislation.

The language used in section 302 (d) is specific, and defines a narrow and restricted group or class of educational institutions; the exemption therein provided is confined to those educational organizations which we generally recognize as full-time schools whose curriculum is devoted to general academic courses.

While it was the testimony of petitioner's witnesses that the Furnace Company stock was acquired and the Foundation was organized for the sole benefit of the Shattuck School, the stated purposes of the

Foundation show that in the making of grants of principal and income it is not necessarily restricted to Shattuck School, but may make such grants to "nonprofit corporations organized under the laws of the State of Minnesota for educational purposes, and in particular to such corporations which may be engaged in conducting schools of learning for the education of boys below the college or university level." Not only does the record show that the Shattuck School is an educational organization such as is described in section 302 (d), but it is clear, we think, that any other corporation which can qualify for the receipt of grants from the Foundation is likewise an educational organization described in section 302 (d). On the facts herein, it is thus apparent that all of the net earnings of the Furnace Company must inure to the benefit of an educational organization or organizations described in section 302 (d) and none of the earnings can inure to the benefit of any private shareholder or individual. We accordingly conclude and hold that for the years herein the Furnace Company was exempt from tax under section 302 (d).

Reviewed by the Court.

*Decisions will be entered for the petitioners.*

Opper, *J.*, concurs in the result.
Fisher, *J.*, dissents.

———

Pierce, *J.*, dissenting: I am unable to agree that, on the basis of the facts here presented, we are warranted in disapproving the rulings and determinations of the Commissioner of Internal Revenue, to the effect that neither of the two petitioner corporations qualified, during any of the taxable years involved, as an organization exempt from income taxes.

Both corporations were organized pursuant to a preexisting arrangement which, in my opinion, was not made exclusively for charitable purposes—but which was rather, in principal part, for the benefit of three private individuals. Neither corporation was, in my opinion, operated during any of the taxable years, exclusively for the purpose of performing any true charitable function—but rather for the purpose of permitting said three individuals to obtain the benefit of distributions of corporate profits, without any tax on such profits before distribution and with the distributions being taxed only at capital gain rates, through means of a purported "sale" of the distributing corporation's stock for no actual consideration other than the dividends from said stock to which the individuals would have been entitled if such sale had not been made. As regards benefits to charity, the fact is that although both corporations derived large amounts of income during each of the years involved, substantially all such income passed irrevocably, pursuant to the preexisting arrangement, into the

hands of the private individuals, and not one cent of the same found its way either into any charitable work or into the hands of any other organization which engaged in such charitable work.

I do not suggest, of course, that tax avoidance motives will invalidate a bona fide business arrangement. But I do suggest that in construing and applying the provisions of a statute which gives tax exemption only when the claimant has been both organized and operated exclusively for charitable purposes, we are entitled to examine all the surrounding facts and circumstances, including the motives of the parties, for the purpose of determining whether the requirements of the statute have been met. The principle is well settled that any taxpayer claiming exemption from tax must bring himself squarely within the terms of the exemption statutes; and that such statutes are to be construed strictly.

The answer to whether the present petitioners were organized exclusively for charitable purposes can, it seems to me, best be found in the events which preceded their organization, rather than in the declarations of their charters. The picture here presented is that early in 1948 a representative of three individuals who owned the stock of an operating corporation (the old Furnace Company) negotiated a plan with representatives of the Shattuck School, whereby the School might, after a deferred period of 5 or 6 years, acquire the stock of the Furnace Company without any outlay of cash or property other than incidental expenses; and whereby, during such deferred period, the three individuals would continue to manage the Furnace Company under a noncancelable management contract, and continue to receive the benefits of the dividends from that company in the form of capital payments, undiminished by any State or Federal income taxes on the Furnace Company's income. The crux of the plan was first to organize a new corporation for declared charitable purposes (the Foundation), so as to free the school from any possible liability under the plan; to have said Foundation "purchase" the Furnace Company stock from the three individuals, for no other consideration than its own promissory notes which would be unsecured except by the stock thus acquired; to attempt to have both the Furnace Company and the Foundation qualified as tax-exempt organizations; and then, as the tax-free earnings of the Furnace Company flowed into the Foundation as dividends, to have practically all of the proceeds from these dividends pass on to the three individuals as capital payments for the stock. The plan was to continue in operation until the individuals had received $250,000 plus interest; and the management contract with the individuals was to remain in force until such amount with interest had been paid in full. If the arrangement between the parties were terminated, due either to the Foundation not receiving a tax-exempt status, or to default in the payments of principal and interest

to the individuals, then the Foundation was to return the stock to the individuals.

If the sole object of the parties had been to give the benefits of the stock to the Shattuck School after the anticipated deferred period of approximately 6 years, it would seem that no such elaborate plan would have been necessary; nor would it have been necessary for the school to divorce itself of all legal interest in the stock by placing it in a new corporation. Such transfer of benefits after a deferred period could, and normally would, have been accomplished by placing the stock in trust or in escrow or under a pledge to secure a gift to take effect in futuro. But if any of these procedures had been adopted, it is obvious that the earnings of the Furnace Company would have continued to suffer the erosion of Federal income taxes, and the dividends would have continued to be taxable to the individuals as ordinary income. Thus, it was essential to the individuals, if they were to obtain the tax benefits, for the transfer of stock to be cast in the form of a "sale," rather than in the form of a gift to take effect in the future; but so far as charity was concerned, a "sale" was not essential for, whatever the form, charity could expect no substantial benefits until after the individuals had first received the $250,000 plus interest.

Whether the $250,000 to be paid to the individuals represented the fair market value of the stock, cannot be determined in the absence of balance sheets, earning statements, or appraisals; and since the Foundation was to obtain the stock without any outlay of its own capital, it was in no position to force price adjustments by bargaining. Thus it cannot be determined whether the $250,000 measured anything, except the amount which the three individuals had decided to withdraw, before charity would be permitted to receive any substantial benefits.

Was the Foundation operated exclusively for charitable purposes? The indications are that it performed no substantial functions during the years involved, except to passively hold the Furnace Company stock, collect the dividends therefrom, and turn over most of the proceeds from these dividends to the three individuals, pursuant to the preexisting agreement. It received no gift or contribution of capital, other than the original $1,000 donation from the school; and it had no income other than from the Furnace Company stock. It made no distribution to any charitable institution. There is no indication that it had any office, or operating personnel other than its trustees. Its only operating expenses during the first taxable year consisted of $38.90 paid for a filing cabinet, $153.94 paid to an attorney for organization expenses, and $2 paid for telephone; in the second taxable year its only operating cost was $108 paid for attorney's travel expense; and for the third year there apparently were no operating expenses. During these same 3 years, the Furnace Com-

pany had aggregate net income of $173,307.47, of which $139,669.76 was paid as dividends to the Foundation, and of which $133,112.55 then passed to the individuals. Indeed, it would appear that there was no necessity for the Foundation to even handle the dividends, for the "purchase agreement" provided that the Foundation would not permit the Furnace Company to declare or pay any dividends "unless said dividends shall, promptly after the payment thereof, be applied by the Furnace Company [the issuer of the dividends] to or toward the payment and discharge of the outstanding notes [held by the individuals]."

I find nothing in such a picture to indicate that the Foundation was operated during the taxable years involved, exclusively for charitable or benevolent purposes. We, of course, have no jurisdiction to consider whether it might qualify for exemption in some future year. Indeed, whether it would then have income, how such income would be distributed, or what the provisions of the then existing exemption statutes might be, can only be conjectured.

I find no authority in the statute for granting exemption to an organization which is organized and operated solely to hold stock, collect the income, and devote such income to deferred payments on the stock, even though there may be an expectation that income for charity may become available at some future date. Section 101 (14) pertains particularly to corporations organized to hold title and collect income therefrom; but it grants exemption only where there is a "turning over" of the entire income, less expenses, to an organization which itself is exempt from tax. The Foundation definitely did not meet these requirements. To grant it exemption under section 101 (6), when its activities as a holder of stock do not meet the requirements of section 101 (14), would appear to render the latter section meaningless.

Finally, I cannot agree that the Furnace Company is entitled to exemption under section 302 (d) of the Revenue Act of 1950, as added by section 601 of the Revenue Act of 1951. This section does not itself provide any exemption. It merely states, in substance, that a corporation shall not be denied exemption under section 101 by reason of carrying on business for profit, *if all the net earnings* inure to the benefit of another organization of one of *only three specified types:* "[1] an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly organized body of pupils * * *, or [2] to the benefit of a hospital, or [3] an institution for the rehabilitation of physically handicapped persons * * *." No other type of institution is specified, even though other types are comprehended within section 101 (6). To me the conclusion is inescapable that Congress did not intend to provide exemption to a so-called feeder company, unless the institution receiving the benefit

of its income is an existing institution of one of the three specified types. It is obvious that the Foundation, which received substantially all the operating Company's earnings, did not maintain a school, a hospital, or an institution for the rehabilitation of physically handicapped persons; and most of its income actually went into the hands of private individuals. Even as to any future income which the Foundation might have for distribution in later years, the ultimate beneficiary cannot be determined, for no particular beneficiary is named in the Foundation charter, and until its trustees make a selection, it is impossible to foresee what the selection may be. Thus, here we have at most a charter declaration of a general charitable purpose, which is not sufficient to meet the requirements of the exemption statute.

I would approve the determinations of the Commissioner and deny the claims of both petitioners to exemption from tax. I would further hold, however, that the Foundation is not taxable with the dividends from the Furnace Company, not because it is exempt but because it held only a naked title to the stock, and that the beneficial ownership of the dividends was in the individuals.

ATKINS, *J.*, agrees with this dissent.