**MOBILE ARTS AND SPORTS ASSOCIATION, Inc., a corporation, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 1641.**

United States District Court
S. D. Alabama, S. D.
Jan. 31, 1957.

T. K. Jackson, Jr., and John W. Mc-
Connell, Jr., of Armbrecht, Jackson, Mc-
Connell & DeMouy, Mobile, Ala., for
plaintiff.

Ralph Kennamer, U. S. Atty., Mobile,
Ala., Robert H. Showen, Atty., Dept. of
Justice, Washington, D. C., for defend-
ant.

THOMAS, District Judge.

This suit is for refund of federal
income taxes paid by plaintiff for the
fiscal years 1952, 1954, and 1955, after
plaintiff's claimed exemption was denied.
The legal issues involved are the same
for all three years. Plaintiff claims
income tax exemption as an educational
corporation, or as a civic organization,
or both. The government rejects these
contentions, and further answers that
if it should be shown the taxpayer is an
educational corporation within the mean-
ing of the Internal Revenue Code, never-
theless the income which the taxpayer
received was taxable as "unrelated busi-
ness income". All of the income involved
in the controversy was derived from
plaintiff's operation of an annual bowl
football game known as the "Senior
Bowl Classic".

### Findings of Fact

The determining question here (which
is plaintiff's status and the relationship
of plaintiff's status to its income) can
best be resolved after a thorough review
of the circumstances leading to plaintiff's
formation. The Senior Bowl game
originated as a commercial enterprise
operated for profit by residents of Ten-
nessee. The first game put on by the
Tennessee group was played in the Gator
Bowl Stadium in Jacksonville, Florida,
and the second game was played in the
Ladd Memorial Stadium at Mobile.
Each of these first two games was oper-
ated at a loss, totaling approximately
$29,000; and it became apparent that
the game could not continue under its
then setup. At this point, the Tennessee
originators approached Mr. J. F. McRae,
then and now president of the Merchants
National Bank of Mobile, with the idea
of working out an arrangement whereby
the game could be continued as an annual
event in Mobile. It was suggested to
Mr. McRae that the Tennessee origi-
nators would relinquish all rights in
this venture upon the payment of the
deficit thus far sustained. Mr. McRae,
visualizing the benefits which Mobile
and its citizens might derive from such
a game, discussed the idea with twenty-
six prominent, civic-minded citizens, each
of whom agreed to underwrite in varying
amounts a total of $60,000, for the pur-

pose of making this game a Mobile civic venture. Certain of this group felt that such a move should not be confined wholly to sports, since the community was in need of a non-profit organization which could not only put on the Bowl game but would also sponsor and operate other activities of an artistic and educational nature that would be of benefit to the community. Plaintiff's articles of incorporation were tailored accordingly. Thus the Mobile Arts and Sports Association, hereinafter referred to as MASA, had its beginning.

The annual Senior Bowl game has proved to be of considerable benefit to the community because of the favorable publicity which the game engendered for Mobile throughout the nation; because of the large number of out-of-town visitors that were brought to the city; and because of the inspirational value to the youths of the city of Mobile and surrounding community in respect to their own recreational activities.

The articles of incorporation provide:

"II. The objects for which this Corporation is formed are:

"To promote, create, establish, assemble, organize, produce, own, control, display, conduct and manage any and all types, kinds and classes of knowledge, arts, sciences, public recreation, sporting, athletic, skilled, artistic, educational and esthetic exhibitions, contests, games, performances, enterprises, productions, pageants and other attractions for the development and advancement of the City and County of Mobile and its environs without pecuniary profit to the individual members of said corporation."

It was recognized at the outset that the Bowl football game might not be profitable from a business standpoint, but the members of the organization believed that the game was of sufficient value to the community to warrant securing it without regard to its soundness as a profit-making venture. It was decided that if any profits should result,

they would be used for other civic and educational activities enuring to the public welfare; and the Corporate Charter of MASA so provided.

The government contends that the game has been operated for the purpose of making a profit like any normal business venture. The evidence is to the contrary.

MASA was organized in 1951 under the laws of the State of Alabama, Code of Alabama 1940, Title 10, Sec. 124, which provide:

"Churches, educational or benevolent societies, etc.—The members of any church, or conference of churches, or religious society, or educational society or benevolent, monument or burial society, patriotic society, or societies for the purpose of nature study or scientific research or society for establishing public parks, or places of public recreation, or societies for promoting knowledge, promoting arts, promoting sciences, or societies for purposes of like kind, or the owners of a grave yard, or the trustees of any of the foregoing churches, conferences, institutions, or societies, elected by the organization or organizations of the church, conferences, institution, association, or society, desiring to become incorporated, shall adopt a resolution signifying such intention and elect not less than three, nor more than twenty-four trustees."

MASA's profits, if any, cannot enure to the benefit of any individual member of the organization and must be used for other public welfare, civic, and educational purposes.

The Charter provides:

"This corporation is and shall forever remain a non-profit-sharing organization; there are not and shall never be any shareholders or stockholders and no part of the net earnings thereof shall enure to the benefit of any individual member. This corporation shall endure and have corporate existence perpetual-

ly; but in the event its purpose should ever fail or in the event it should for any reason whatsoever cease to function, no part of its properties, funds or assets shall ever be divided among or enure to the benefit of any of its members." And further,

"The corporation may accumulate money but shall from time to time as directed by the Board of Trustees, disburse all or a portion of all such money * * * to or on behalf of persons, firms, associations, societies or corporations * * * whose primary purpose is devoted to a betterment and advancement of the civic, social, cultural, recreational and artistic life of the Community of Mobile and its environs."

The undisputed testimony shows that the intention and purpose of the group in organizing MASA was to provide the residents of the city of Mobile and surrounding community with a vehicle that would make it possible for the community to retain the Bowl game and to support other educational, recreational and cultural activities which were believed to be of need and benefit to the individual residents of the area and to the community as a whole. The Bowl game has been put on by MASA each January since 1952.

During the five years of its corporate existence MASA has engaged in the following activities in addition to putting on the Senior Bowl game: sponsorship (including financial assistance) of an annual collegiate basketball tournament; of outdoor symphony concerts open to the public; of ballet performances; of choral singing performances; and spon-

sorship jointly with the Mobile Touchdown Club [1] (an organization already exempt under the statutes here in question) of a recreational program for several thousand youths of the city. In virtue of the assistance rendered by MASA, the foregoing activities were either made free to the public or offered at reduced admission price. All organizations receiving assistance from MASA are exempt from federal income taxes. The only activity which has provided any net income to MASA is the Bowl game. The fact that part of this income was used to pay for the rights to the game is not controlling.[2]

The testimony also showed that in addition to the direct benefit derived by those attending these performances, the broad overall aspects of the performances were of substantial intangible value to the community as a result of the favorable advertisement of the city of Mobile to its neighbors and other communities throughout the nation. Accounts of the Senior Bowl game are carried under a Mobile date line in practically all of the daily newspapers in the nation, and the game has been broadcasted annually on a national and international radio network.

The executive and administrative officers of the corporation (including the corporation's attorneys and accountants), have at all times served without salary or expectation or of remuneration of any kind. The capital on which the corporation has operated has largely been obtained through loans made possible by the corporation's members. These loans, which have run as high as $52,500, were in the form of notes guaranteed by the individual members. The members could

---

1. A youth recreational program virtually encompassing all of the young boys in the city and outlying community. It operates in this manner: The various youngsters enrolled in the public (and some private) schools are divided into age groups; they are furnished, free of charge, football, baseball or basketball equipment (depending upon the season), are organized into teams and leagues and given skilled instruction by

adults experienced in these various sports. The record shows that during the years that the taxpayer has participated in this program, i. e., 1954, 1955 and 1956, a total of 549 teams, comprising 11,832 boys, participated in this program.

2. Ohio Furnace Company, 1955, 25 T.C. 179.

not receive interest or other material benefit for their loans; on the contrary, they stood to lose substantial amounts of money, and risked capital without hope of material reward of any kind. In fact, the corporation introduced evidence to show that substantial contributions in cash would have been made by members and other civic-minded citizens but for the fact that such contributions were not exempt from taxation under the position taken by the government.

The Bowl game played during the corporation's 1953 fiscal year resulted in a loss. Nevertheless the game was continued during the following years. The testimony of the officers of MASA is to the effect that they hope to continue operating the game for the benefit of the community even if it never shows a profit.

It is clear that from the time of its inception MASA has made substantial civic, educational and cultural contributions to individual citizens of Mobile and to the whole community and has been organized and operated exclusively for one or more of the purposes specified in Sections 101(6) and 101(8) of the Internal Revenue Code of 1939, 26 U.S.C.A., and Sections 501(c) (3) and 501(c) (4) of the Internal Revenue Code of 1954, 26 U.S.C.A. [3]

This brings us to consideration of the question of whether or not the income received from the operation of the game is "unrelated business income". In considering the issues to be determined here the statutes relating to "unrelated business net (taxable) income" under the 1939 Internal Revenue Code may be treated as being identical to the similar statutes under the Internal Revenue Code of 1954. Section 513 of the 1954 Code provides:

"(a)   General rule.—The term 'unrelated trade or business' means,

in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a) (2) (B), to the exercise or performance of any purpose or function described in section 501(c) (3)), except that such term does not include any trade or business—

"(1)   in which substantially all the work in carrying on such trade or business is performed for the organization without compensation; or

"(2)   which is carried on, in the case of organization described in section 501(c) (3) or in the case of a college or university described in section 511(a) (2) (B), by the organization primarily for the convenience of its members, students, patients, officers, or employees; or

"(3)   which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions."

A scrutiny of the mechanics of production of the Senior Bowl Classic reveals that it is a football game between two all-star teams, the individual members of which participate by invitation and come from colleges all over the United States. Each member of the winning team is paid $500 and each member of the losing team receives $400. The game manager and the

---

3. See Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458; Scofield v. Rio Farms, Inc., 5 Cir., 205 F.2d 68; Willingham v. Home Oil Mill, 5 Cir., 181 F.2d 9; C. F. Mueller Co. v. Commissioner of Internal Revenue, 3 Cir., 190 F.2d 120; Sico Co. v. United States, 102 F.Supp. 197, 121 Ct.Cl. 373; Jack Little Foundation for Aid to the Deaf v. Jones, D.C.W.D.Okl., 102 F.Supp. 326.

coaches of the respective teams are also paid for their services. To be eligible for invitation, a player must be a senior in college and must be finished with all competition in collegiate athletics. On the day it is played, it is the only bowl football game in the nation and is not in competition with any other game. The game is played in Ladd Memorial Stadium located on city property. The Stadium Corporation (itself exempt from taxation) receives a portion of the game receipts. Tickets are sold to the general public at prices ranging from $3 to $6 per ticket. However, some eight thousand tickets (slightly over 25% of the total tickets sold) are sold to grade-school children at the price of 50 cents per ticket. These tickets are made available to the children through the public (and a few private) schools located in Mobile and adjacent areas; the schools cooperate with the officials of MASA in arriving at an equitable distribution of the tickets. Some three hundred odd schools participate in this program. MASA's objective in permitting school children to attend for 50 cents is to stimulate their interest and encourage their participation in their own recreational activities. Some income is derived from advertisements in the printed programs which are sold at the game. However, a large percentage of these advertisements are nothing more than gratuitous contributions. The program also is used to advertise other non-profit cultural and recreational activities which contribute to the social welfare of the community. Moving picture film, made of each game played under the sponsorship of MASA, is distributed for showing without charge, on a nation-wide basis, to Touchdown Clubs, civic organizations, schools, and the like. The halftime shows put on by the famed Rangerettes of Kilgore College, Kilgore, Texas, and the Dixie Darlings of Mississippi Southern College, Hattiesburg, Mississippi, provide entertainment with a flavoring of art, dancing and music, and undoubtedly have some educational and publicity value.

The conducting of the Bowl game was and is an integral part of MASA's civic and educational program and bears a close and intimate relationship to the civic and educational objects for which MASA was organized. It follows that MASA's income from the game was not "unrelated business income." [4]

### Conclusions of Law

1. The court has jurisdiction of the subject matter and parties hereto.

■■ 2. During its tax years 1952 and 1954, MASA was an exempt corporation within the meaning of sections 101(6) and 101(8) of the Internal Revenue Code of 1939 and did not receive any "unrelated business income" within the meaning of sections 421–422 of the Internal Revenue Code of 1939.

■ 3. During its tax year 1955, MASA was an exempt corporation within the meaning of sections 501(c) (3) and 501(c) (4) of the Internal Revenue Code of 1954 and did not receive any "unrelated business income" within the meaning of sections 511–513 of the Internal Revenue Code of 1954.

A judgment in accordance herewith will be entered.

---

4. The facts here are readily distinguishable from those in United States v. Community Services, 4 Cir., 189 F.2d 421, 424. There, the taxpayer "operated a canteen refreshment service, a coal and wood yard, a filling station, and an electrical appliance store". The court stated: "Taxpayer was, in effect, organized and operated for two purposes: (1) *to engage in commercial business, for profit; and* (2) to turn over the profits realized from its commercial activities to charitable organizations." (Emphasis added.) No such purpose is apparent from the evidence in the instant case. Rather, the income from the game is more nearly akin to income from the operation of a fair, Southeastern Fair Ass'n v. United States, 52 F.Supp. 219, 100 Ct.Cl. 216; or the operation of a rodeo, Campbell v. Big Spring Cowboy Reunion, 5 Cir., 210 F. 2d 143, 42 A.L.R.2d 1015; or the operation of a bookstore and restaurant by a student association, Squire v. Students Book Corp., 9 Cir., 191 F.2d 1018.