*Decision will be entered under Rule 50.*

JOHN DANZ CHARITABLE TRUST, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65761.    Filed May 29, 1959.

*Griffith Way, Esq.*, for the petitioner.
*Wilfred H. Payne, Esq.*, for the respondent.

OPINION.

TRAIN, *Judge:* Respondent determined deficiencies in the petitioner's income tax in the amounts and for the years as follows:

| Year | Deficiencies |
|------|------|
| 1948 | $12,596.07 |
| 1950 | 19,676.39 |
| 1953 | 10,966.83 |
| 1954 | 14,314.59 |

The issues are:

(1) Whether the petitioner is exempt from taxation for the years 1948, 1950, and 1953 pursuant to section 101(6) of the Internal Revenue Code of 1939, and for the year 1954 pursuant to section 501(c) (3) of the Internal Revenue Code of 1954;

(2) If petitioner is not exempt from tax, whether it is limited to deductions for amounts in fact "paid" to charitable beneficiaries, or, did it "permanently set aside" any further part of its gross income for charitable purposes, thus entitling it to deductions equal to such amounts, for the years 1948, 1950, and 1953 pursuant to section 162(a) of the Internal Revenue Code of 1939, and for the year 1954 pursuant to section 642(c) of the Internal Revenue Code of 1954;

(3) If petitioner is limited to deductions for amounts actually paid to charitable beneficiaries pursuant to section 162(a) of the Internal Revenue Code of 1939, then whether such deductions for the years 1948 and 1950 should be reduced because allegedly paid in part from the nontaxable portion of gains which were treated as gains from the sale or exchange of capital assets held for more than 6 months.

All of the facts are stipulated and are hereby found as stipulated.

The material facts in this case are basically the same as in *John Danz*, 18 T.C. 454 (1952), affirmed sub nom. *John Danz Charitable Tr.* v. *Commissioner*, 231 F. 2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828 (1956), rehearing denied 353 U.S. 951 (1957), and the stipulation of facts and findings of fact in that case, except as modified and augmented by the stipulation of facts herein are stipulated to be the facts of the instant case.

The John Danz Charitable Trust, hereinafter referred to as petitioner or as the Trust, is an irrevocable trust created by agreement executed December 31, 1942, between John and Jessie Danz, as grantors, and John Danz, Fred Danz, and William Danz, as trustees.

Petitioner filed fiduciary income tax returns for the calendar years here involved with the district director of internal revenue at Tacoma, Washington. Petitioner and respondent executed timely consents to extend the period of limitations on assessment of income and profits taxes for the years 1948 and 1950 to June 30, 1957. The respondent's

notice of deficiency for the years here in question was mailed on November 29, 1956.

During the years involved in the prior case, 1943 to 1947, inclusive, the petitioner operated two businesses which accounted for the larger part of the income of the Trust. The most substantial one of these businesses was the Savoy Hotel in the city of Seattle, including furniture and fixtures therein, owned by the petitioner and operated by it from the date of its acquisition in 1943 until January 1, 1948. During that period, petitioner received business income and incurred business expenses in connection with its operation of the hotel. The average of the annual gross receipts from the Savoy Hotel for the years 1943 through 1947 was approximately $141,000, the operating expenses approximately $96,400, and the net income approximately $44,600. The intention of the trustees in purchasing the Savoy Hotel property in 1943 was to operate it, through a real estate company as agent, only until the personal property could be sold and the real property leased to a hotel operator.

By lease effective January 1, 1948, petitioner leased the Savoy Hotel to Northwest Operating, Inc., a hotel operator. The lease was for a term of 10 years, commencing January 1, 1948. The rental provided for the hotel was a minimum monthly rental of $1,800, together with 25 per cent of the gross income derived from hotel operations in excess of $7,200 per month. With respect to the store space in the building, the lease provided a minimum monthly rental of $500, together with 75 per cent of the gross income derived from its subrental. Northwest Operating, Inc., simultaneously purchased from petitioner the furniture and equipment in the Savoy Hotel for the price of $60,000. Petitioner simultaneously assigned to Northwest Operating, Inc., its lessor's interest in a 5-year lease of a certain storeroom and its lessor's interest in month-to-month tenancies of certain other storerooms, all located in Seattle, Washington. Neither the grantors nor any of the trustees of petitioner had or have any interest in Northwest Operating, Inc. The sale price of the furniture and fixtures and the rental agreement for the hotel property were reasonable.

The other business operated by petitioner during the years at issue in the prior case involved three retail candy shops. One of these was acquired on September 10, 1943, for $1,514.75, another on September 22, 1943, for $875, and a third on January 31, 1944, for $1,500. The total sales of the candy shops from 1943 through 1947 were $329,233.95, net sales $158,689.10, and expenses $106,435.75. The total net profit from the operation for the same period was $52,650.44. The candy stores were operated in 1948 with net sales of $22,666.95 and a net

profit of $1,384.29. Each candy shop was adjacent to a theater owned or managed by Sterling Theatres, Inc. Jessie managed the three candy shops without pay because she wanted to make a contribution in that fashion to the acquisition of funds for petitioner.

The candy shops were all sold by the Trust in June 1949.

No amendments were made to the trust agreement creating the Trust during the years involved in the prior case. However, two amendments were made during the period here involved. On June 15, 1948, an amendment provided that "[n]o funds of these trusts may be loaned directly or indirectly to grantors or either of them." In fact, neither prior to that amendment nor subsequent thereto have any of the funds of the Trust been loaned directly or indirectly to the grantors. On March 21, 1949, a further amendment was made to the trust agreement adding the Seattle Trust & Savings Bank, a national banking corporation of Seattle, Washington, as a fourth trustee of petitioner. This amendment stated that none of the powers of the trustees of petitioner shall be exercised except with the affirmative approval of the Seattle Trust & Savings Bank or unless the bank is one of the trustees voting in favor of the action.

John, William, and Fred had served as trustees of petitioner from the time of its inception until March 21, 1949, at which time the Seattle Trust & Savings Bank was added as trustee by the second amendment described above. These four trustees served until May 21, 1952, when Albert D. Walderon was elected as an additional trustee in place of William, who resigned. Petitioner has paid no compensation to any of the trustees with the exception of the Seattle Trust & Savings Bank which received compensation in accordance with its usual fee schedule for acting as trustee of trusts of this type. John and Jessie are not stockholders, directors, officers, or otherwise interested in Seattle Trust & Savings Bank.

No part of the income or principal of the Trust has inured directly or indirectly to the benefit of the grantors, John and Jessie. No joint investments nor any commingling of assets or income have been made with any other trusts created under the trust instrument or with any other person, trust, or corporation.

The investments of petitioner during each of the years in issue in the instant case consisted entirely of listed securities (except for the donated stock of Sterling Theatres, Inc., which was only a small part of the total outstanding stock of that corporation and played no part in the control or management of the corporation) and improved real property. Two of the four pieces of real property held by petitioner through 1949, and three of the four pieces of real property held from 1950, were for the primary use of the Humanist Societies of Washing-

ton, San Francisco, and Los Angeles. In 1948, the Trust also had inventories of $1,659.03 and equipment costing $5,312.92 in connection with the three small candy stores operated by the Trust until they were sold in June 1949.

The net worth of the Trust was $65,862.62 at the end of 1943, $448,-420.09 at the end of 1947, $500,070.25 at the end of 1948, and $451,-646.79 at the end of 1954. The accumulated net income from the beginning of the Trust in 1943 to the end of the year 1947 was $338,888.75, to the end of 1948, $390,528.25; however, at the end of 1954 it had decreased to $273,879.79. Capital gains accounted for $246,999.73 of the accumulated net income from the beginning of the Trust in 1943 through 1954; capital gains for the years 1948 through 1954 amounted to $198,346.25. For the 7 years 1948 through 1954, there was a decrease in accumulated net income.

The net income during the years before us consisted entirely of rents, dividends, interest, and gains on sales of securities and real property, except for the year 1948 when $1,384.29 net profit was received from the operation of the three candy stores.

The investment activity of petitioner consisted of 7 purchases of various stocks during the year 1948; the purchase of the Hoover Street property in Los Angeles for the Humanist Society of Los Angeles and 1 stock purchase, and the sale of 1 piece of real property and 3 stocks during 1950; no purchases or sales during 1953; and 12 stock purchases and 6 stock sales during 1954. All capital transactions were long-term.

These purchases and sales were, specifically, as follows:

SCHEDULE OF ALL PURCHASES AND SALES OF INVESTMENT PROPERTIES FOR YEARS 1948, 1950, 1953, AND 1954

| 1948 | Description | Number of shares | Purchase price | Sale price |
|---|---|---|---|---|
| May 17 | National Gypsum | 250 | $3,375.60 | |
| July 7 | National Bellas Hess | 500 | 2,357.50 | |
| July 7 | Spiegel, Inc. | 1,000 | 12,285.60 | |
| July 7 | Avco Mfg. Co. | 1,000 | 6,375.13 | |
| July 7 | Curtis Publishing Co. | 1,000 | 10,991.72 | |
| July 13 | National Bellas Hess | 500 | 2,358.70 | |
| Aug. 25 | Curtiss Wright | 1,000 | 9,998.54 | |
| | Total | | 47,742.79 | |
| **1950** | | | | |
| Apr. 17 | Deposit on Hoover Street property | | $10,000.00 | |
| May 18 | Sale of 7th & Pike property | | | $147,497.67 |
| May 18 | Payment on Hoover Street property | | 44,221.65 | |
| June 8 | Southern Pacific RR. | 500 | 27,469.81 | |
| Dec. 22 | National Bellas Hess | 1,000 | | 2,784.44 |
| Dec. 27 | Spiegel, Inc. | 1,000 | | 10,452.64 |
| Dec. 27 | Curtis Publishing Co. | 1,000 | | 7,923.17 |
| | Total | | 81,691.46 | 168,657.92 |

| 1954 | Description | Number of shares | Purchase price | Sale price |
|---|---|---|---|---|
| Aug. 11 | Loew's, Inc. | 1,000 | $17,851.30 | |
| Aug. 11 | RKO Theatres | 1,000 | 8,256.30 | |
| Aug. 11 | 20th Century Fox | 1,000 | 24,898.10 | |
| Aug. 11 | Columbia Pictures | 1,000 | 29,169.40 | |
| Aug. 11 | Warner Bros. Pictures | 1,000 | 18,987.50 | |
| Aug. 11 | Paramount Pictures | 2,000 | 70,499.28 | |
| Aug. 11 | Amer. Bdcst. Para. Theatres | 1,000 | 20,501.30 | |
| Sept. 20 | 20th Century Fox | 3,000 | 77,445.59 | |
| Sept. 20 | Loew's, Inc. | 2,000 | 36,750.39 | |
| Sept. 20 | Amer. Bdcst. Para. Theatres | 1,000 | 20,224.56 | |
| Sept. 20 | Universal Pictures | 400 | 10,210.51 | |
| Sept. 20 | Avco Mfg. Co. | 1,000 | | $5,868.38 |
| Sept. 20 | Curtiss Wright | 1,000 | | 12,541.74 |
| Sept. 20 | Westinghouse | 500 | | 32,767.40 |
| Sept. 20 | St. Regis Paper | 1,000 | | 30,054.29 |
| Sept. 20 | Sinclair Oil | 600 | | 26,080.14 |
| Sept. 20 | National Gypsum | 26½ | | 891.15 |
| Dec. 29 | American Airlines | 600 | 13,500.00 | |
| Total | | | 348,294.23 | 108,203.10 |

The petitioner's capital gains and losses and the dates it acquired and sold such properties for the years 1943 through 1954, inclusive, were as follows:

SCHEDULE OF CAPITAL GAINS AND LOSSES 1943–1954 [1]

| Year | Kind of property | Date acquired | Date sold | Sales price | Cost | Gain (or loss) |
|---|---|---|---|---|---|---|
| 1943 | None | | | | | |
| 1944 | None | | | | | |
| 1945 | 600 shares Midland Steel | October 1943 | January 1945 | $22,275.26 | $17,691.64 | $4,583.62 |
| 1946 | Stores—8th & Pike | August 1943 | January 1946 | 86,935.97 | 42,866.11 | 44,069.86 |
| 1947 | None | | | | | |
| 1948 | Savoy Hotel furnishings | August 1943 | 1948 | 60,000.00 | [2] 9,986.45 / 3,750.50 | [3] 46,263.05 |
| 1949 | None | | | | | |
| 1950 | 7th & Pike property | Sept. 10, 1943 | May 18, 1950 | 155,000.00 | 83,130.24 | |
| | 1,000 shares Natl Bellas Hess. | July 7, 1948 | Dec. 22, 1950 | 2,784.44 | 4,716.20 | |
| | 1,000 shares Spiegel, Inc. | July 7, 1948 | Dec. 27, 1950 | 10,452.64 | 12,285.60 | |
| | 1,000 shares Curtis Pub. Co. | July 7, 1948 | Dec. 27, 1950 | 7,923.17 | 10,991.72 | |
| | | | | | | [4] 65,036.49 |
| 1951 | San Francisco house and land. | 1947 | May 10, 1951 | 43,000.00 | 36,346.00 | |
| | Anaconda Copper | | October 1951 | 101,248.34 | 88,484.58 | |
| | Boeing Airplane Co | | October 1951 | 50,145.40 | 24,774.91 | |
| | Westinghouse Electric | | October 1951 | 20,162.81 | 13,420.83 | |
| | Southern Pacific RR | | October 1951 | 26,266.50 | 21,975.84 | |
| | | | | | | 55,820.89 |
| 1952 | None | | | | | |
| 1953 | None | | | | | |
| 1954 | 1,000 shares Avco Mfg. Co. | July 7, 1948 | Sept. 20, 1954 | 5,868.38 | 6,375.13 | (506.75) |
| | 1,000 shares Curtis-Wright | Aug. 25, 1948 | Sept. 20, 1954 | 12,541.74 | 9,998.54 | 2,543.20 |
| | 500 shares Westinghouse | Oct. 18, 1946 | Sept. 20, 1954 | 32,767.40 | 13,420.83 | 19,346.57 |
| | 1,000 shares St. Regis Paper | Apr. 30, 1951 | Sept. 20, 1954 | 30,054.29 | 14,421.75 | 15,632.54 |
| | 600 shares Sinclair Oil | Dec. 26, 1951 | Sept. 20, 1954 | 26,080.14 | 25,425.00 | 655.14 |
| | 26½ shares National Gypsum. | Oct. 18, 1946 | Sept. 20, 1954 | 891.15 | 525.58 | 365.57 |
| | | | | 108,203.10 | 70,166.83 | 38,036.27 |

[1] The figure of $155,000 for the sale price of the 7th & Pike property sold in 1950 is different than the figure of $147,497.67, set forth in the prior schedule. The adjustment to the gain for the year 1950, however, reduces this apparent discrepancy to the amount of $372.17, which remains unexplained. This schedule is also incomplete in that it does not list the dates of acquisition of the stocks sold in 1951. However, it appears from the prior proceeding that these stocks were acquired in 1945 and 1946, see *John Danz*, 18 T.C. 454, 458 (1952), with the exception of the Southern Pacific Railroad stock, which was acquired on June 8, 1950.

[a] Cost.    [2] Adjusted to $46,582.76.    [4] Adjusted to $57,906.33.

Petitioner has not made any purchase of securities or other property for more than an adequate consideration in money or money's worth. All purchases have been from outside persons and have constituted arms-length transactions. Securities have been purchased on the public stock exchanges. No securities or other property have been purchased from John or Jessie.

Petitioner has not sold any part of its securities or other property for less than an adequate consideration in money or money's worth. All stocks have been sold on the public stock exchanges. All real estate has been sold to outsiders at its fair market value or leased to outsiders for a reasonable rental. No securities or other property of petitioner have been sold or otherwise transferred to John or Jessie.

Payments of compensation by petitioner have not been in excess of a reasonable allowance for necessary personal services actually rendered to petitioner in connection with the investment and management of its properties and the donations of its funds to charitable, educational, and religious organizations.

Donations to the Trust for the years 1948 through 1954 by John and others totaled $68,225 while donations by the Trust to charity for the same period totaled $137,218.89; donations by the Trust hence exceeded donations to the Trust by $68,993.89. In the years 1948, 1950, 1953, and 1954, donations to the Trust totaled $36,300 while donations by the Trust to charity were $52,696.56. Over the entire period of the Trust from 1943 through 1954, donations to the Trust have totaled $177,767 while donations to charity by the Trust have totaled $202,856.43. Thus, an excess in the amount of $25,089.43 has been donated to charity by the Trust over donations received by the Trust.

Of the amount of $202,856.43 of total donations by the Trust from 1943 through 1954, $170,058.89 was donated to or expended for the various Humanist Societies supported by the Trust. Of $137,218.89 donated by the Trust from 1948 through 1954, $123,383.89 was donated to the Humanist Societies. In addition, the Humanist Society of Washington used a large portion of the Sixth and University building owned and maintained by the Trust; the Humanist Society of San Francisco until 1951 occupied a building in San Francisco owned and maintained by the Trust; and the Humanist Society of Los Angeles from 1950 occupied a building owned and maintained by the Trust at 23d and Hoover Streets in Los Angeles. The Humanist Societies of Washington and San Francisco are exempt organizations. The Humanist Society of Los Angeles does not itself possess an exemption certificate, but has been financed to a great extent by the Humanist Society of Seattle, an exempt organization. The respondent makes no point of the fact that the Humanist Society of Los Angeles does not possess an exemption certificate and, for the

purposes of this opinion, we assume that it was a charitable organization during the years in question.

All donations made by petitioner during the years 1948, 1950, 1953, and 1954 were to organizations exempt from income tax under section 101 of the 1939 Code or section 501 of the 1954 Code, contributions thereto being deductible under section 23(o) or 170, bequests thereto being exempt from estate taxes under section 812(d) or 2055, and gifts thereto being exempt from gift taxes under section 1004 or 2522.

Petitioner has not engaged in any activities to influence legislation or carry on propaganda, nor has it participated in or intervened in any political campaign on behalf of any candidate for public office in any manner whatsoever.

Charitable contributions actually paid by petitioner during 1948 were in the sum of $31,351.92 and during 1950 were in the sum of $21,219.64. Petitioner realized long-term capital gains of $46,582.76 in 1948 and $57,906.33 in 1950. The net income of petitioner excluding capital gains was $30,486.48 in 1948 and $31,412.37 in 1950. The Commissioner limited the deduction for charitable contributions to $21,876.99 in 1948 and $14,349.06 in 1950 on the theory that on a pro rata basis $9,474.93 of the contributions in 1948 and $6,870.58 in 1950 should be attributed to the nontaxable portion of the long-term capital gain in those years.

Books and records for petitioner are kept by the trustees at the Palomar Building, Seattle, Washington. The receipts, income, funds, property, and disbursements of petitioner have been separately and fully accounted for and the books and records are complete as to all transactions and clearly reflect those transactions and the status of the accounts. Petitioner maintained separate bank accounts. Title to all of the assets of the Trust has been taken in the name of the trustees.

Petitioner was not a business operating "feeder" and was organized and operated exclusively for charitable purposes within the meaning of the statute during the taxable years in question.

By his amended answer, respondent contends that the prior decision of this Court in *John Danz, supra,* holding that petitioner was not exempt from taxation for the years 1943 through 1947, controls the disposition of the issue in the instant case by the doctrine of res judicata. Secondly, even if that principle be found inapplicable, respondent contends that petitioner does not qualify for exemption because of its formal power to engage in business, and because of the nature of its activities.

Petitioner contends that since the prior decision it has so changed the nature of its operation that it is entitled to exempt status for the years in question.

We agree with the petitioner.

In the prior proceeding we held that petitioner was not entitled to exemption because we found it was not "organized and operated exclusively" for charitable purposes within the meaning of the statute.[2] Specifically, because of petitioner's operation of two profitable businesses we held that it was a "feeder." *John Danz, supra* at 461. The Ninth Circuit, in affirming, relied on *Ralph H. Eaton Foundation* v. *Commissioner*, 219 F. 2d 527 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court, where the taxpayer was likewise held to be a "feeder" actively engaged in several businesses.

Because the years here involved are different from those before us in the prior case, we have before us different causes of action. Further, there are obvious factual differences between the two cases. The respondent's contention that the principle of collateral estoppel governs the disposition of the exemption issue is, therefore, without merit. *Commissioner* v. *Sunnen*, 333 U.S. 591, 598, 599, 601 (1948).

The petitioner's deed of trust specifically empowers the trustees to carry on any trade or business "whether or not speculative" and to invest in any property "whether or not speculative in character." Where such powers have existed, and the activities engaged in pursuant to those powers did not constitute a trade or business in the usual sense of that phrase and were not speculative, and the taxpayer otherwise qualified, this Court has held the taxpayer exempt. *Forest Press, Inc.*, 22 T.C. 265 (1954); *Alan Levin Foundation*, 24 T.C. 15 (1955); *Cummins-Collins Foundation*, 15 T.C. 613 (1950); *Edward Orton, Jr. Ceramic Foundation*, 9 T.C. 533 (1947), affirmed sub nom. *Commissioner* v. *Orton*, 173 F. 2d 483 (C.A. 6, 1949); *Unity School of Christianity*, 4 B.T.A. 61 (1926). The respondent's contention that the petitioner is not "organized exclusively" for charitable purposes because of the mere existence of such powers in the deed of trust cannot be sustained.

Nor do we agree with the respondent's contention that the petitioner's activities were so speculative as to subject its funds to a significant risk of loss and that, therefore, it is not an exempt organization. Petitioner confined its activities to the purchase and sale of real properties and listed securities. The sales were all long-term, and were not so frequent and continual as to constitute a trade or

---

[2] Section 101 of the Internal Revenue Code of 1939 provides, *inter alia:*

The following organizations shall be exempt from taxation under this chapter—

* * * * * * *

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *

Section 501(c)(3) of the Internal Revenue Code of 1954, insofar as applicable to this proceeding, is substantially similar. Therefore, both sections are herein referred to as the "statute."

business. Indeed, examination of the stock transactions during the years involved shows that, with one exception, none of the securities sold had been held for less than 2 years and that several had been held for as long as 8 years. We are unable to spell out from this pattern of investment activity, a speculative business subjecting the funds to a significant risk of loss. Certainly, a charitable organization otherwise exempt should not be denied the right to make such shifts in its investment portfolio as prudence may dictate from time to time. The only unlisted security petitioner owned was the Sterling Theatres stock, donated to it by its founder prior to the years in question. The investments here were no more speculative than was the whisky purchase in *Alan Levin Foundation, supra*, and are not comparable to the short-term investments in highly speculative oil stocks in *Randall Foundation* v. *Riddell*, 244 F. 2d 803 (C.A. 9, 1957), relied on by respondent. See *Trinidad* v. *Sagrada Orden*, 263 U.S. 578 (1924) ; *Cummins-Collins Foundation, supra*. In 1948, petitioner received only about $1,300 from the operation of its candy stores, as compared with an average of over $10,000 a year from that source for the 5 preceding years, and, as we have found, it disposed of the stores in 1949. Thus, the situation in 1948 insofar as the candy stores are concerned is clearly distinguishable from the situation before us in the prior case. We deem the small amount of income earned from the candy stores during the year 1948, in light of petitioner's activities for that year, so negligible that it in itself does not justify treating petitioner as a business operating "feeder" for that year. We do not understand the respondent to contend otherwise.

However, respondent further maintains that petitioner is not "operated" for charitable purposes, because it does not engage in any "functional" charitable activity, but only provides funds and assets for certain exempt organizations. In the prior case, we stated, "This trust did not operate any charity but was a 'feeder' in that its property must ultimately go to a charitable organization." *John Danz, supra* at 461. Such a statement precluded any question of whether the business activity there carried on was incidental to or a necessary part of some charitable activity, in such manner as to justify granting exemption from tax. See *Trinidad* v. *Sagrada Orden, Edward Orton, Jr. Ceramic Foundation, Unity School of Christianity*, all *supra*. However, the statement furnishes no support for a theory that the providing of assets to an exempt organization could never be an activity with a charitable purpose within the meaning of the statute. Indeed, the inclusion of "community chest" in the statute, according to our understanding of such an organization, strongly suggests that Congress was not thinking of such a limitation on "operated" as the respondent proposes. We have previously held that such an activity has a charitable purpose.

*Alan Levin Foundation, Cummins-Collins Foundation,* both *supra; Estate of Louise V. Simpson,* 2 T.C. 963 (1943). The respondent cites no authority to the contrary.

The mere fact that the petitioner need not distribute any moneys to charities within a given year but may accumulate its funds until its founder designates the beneficiary is not itself enough to preclude petitioner's claim. *Ohio Furnace Co.,* 25 T.C. 179, 190 (1955) ; *Alan Levin Foundation, supra.* Its income and corpus must ultimately go to charitable organizations, and if and when there be any unreasonable accumulations, section 504 of the Internal Revenue Code of 1954 provides for a denial of exempt status. The very existence of the latter provision would seem to recognize the possibility of an exempt organization making reasonable accumulations. That petitioner was "operated" during the years in question for charitable purposes is further evidenced by the substantial contributions it made in 2 of those years.

In all other respects the petitioner qualifies as an organization exempt from tax pursuant to the statute.

We hold that the petitioner was organized and operated exclusively for charitable purposes within the meaning of the statute, and petitioner is entitled to exemption from tax during the years in question.

*Decision will be entered for the petitioner.*