John Joseph Cranley, Jr., and Helen Theresa Cranley v. Commissioner.
Cranley v. Commissioner
Docket No. 75035.
United States Tax Court
T.C. Memo 1961-4; 1961 Tax Ct. Memo LEXIS 343; 20 T.C.M. (CCH) 20; T.C.M. (RIA) 61004; January 18, 1961
*343 John Joseph Cranley, Jr., a vascular surgeon, together with his father and a third individual, executed a trust agreement under date of September 9, 1954, creating a foundation known as the Cranley Research Foundation. The Foundation's functions included medical research. They also included the making of tests used in diagnosis and treatment of patients. The petitioner filed his income tax return for the year in question on a calendar year basis. The Foundation was on a fiscal year basis, its first and second fiscal years ending respectively on July 31 of the years 1955 and 1956. Petitioner, during the calendar year 1955 contributed $7,550 to the Foundation, and claimed a charitable deduction in that amount on his 1955 income tax return. The record is silent as to whether the total contribution of $7,550 was made at one time (and if so, the date thereof) or, if on more than one occasion, the respective dates and amounts contributed on each occasion. Held: That petitioner has failed to prove the Foundation, at the time or times the contributions in question were made, was operated exclusively for any or all of the purposes set forth in section 170(c)(2)(B) of the Code of 1954 and that *344 no part of the net earnings of the Foundation inured to the benefit of any individual within the meaning of section 170(c)(2)(C). William R. Seaman, Esq., Union Central Bldg., Cincinnati, Ohio, for the petitioners. Donald P. Krainess, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in petitioners' income tax in the amount of $2,621.97 for the year 1955. The only issue which requires our consideration is whether contributions made by petitioner to the Cranley Research Foundation are allowable as charitable deductions for the year 1955 under the provisions of section 170(a)(1) and 170(c)(2)(B) and (C) of the Code of 1954. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners John Joseph Cranley, Jr., and Helen Theresa Cranley, husband and wife, filed a joint income tax return for the taxable year 1955 with the district director of internal revenue, Cincinnati, Ohio. The joint return claimed a charitable deduction of $7,550 for contributions made by John Joseph Cranley, Jr., (hereinafter referred to as petitioner) to the Cranley Research Foundation *345 (hereinafter referred to as the Foundation). Respondent determined that the deduction was not allowable under section 170 of the Code of 1954. Petitioner is a physician licensed to practice in the State of Ohio. Since 1952 he has practiced as a vascular surgeon, including the diagnosis and treatment of peripheral vascular diseases. He is also a clinical assistant professor of surgery at the University of Cincinnati; Chief of the Vascular Clinic of the Cincinnati General Hospital, and Chief of the Department of Vascular Surgery at Good Samaritan Hospital. In addition, he is on the staff of five other hospitals and is a member of 11 medical societies. Petitioner had been trained in laboratory study of patients with peripheral vascular diseases. There was no laboratory of this type in Cincinnati in 1954. He approached two hospitals with the idea of setting up such a laboratory, but neither was in a position to do so at that time. He then decided to establish a laboratory himself, independent of any hospital. This was accomplished by means of a trust called the Cranley Research Foundation. The trust agreement was executed on September 9, 1954, by petitioner with an endowment of $2,000. *346 Petitioner, Daniel C. Rivers and John J. Cranley, Sr., (petitioner's father) were named as trustees. The trust agreement states, inter alia, as follows: * * *
2. The Trustees shall hold, manage and administer the trust property as herein provided and from time to time use and apply the same, either principal or income or both, or so much thereof as they in their discretion shall deem advisable and ultimately use and apply the entire trust property including principal and all accumulated income and additions thereto, exclusively for such charitable, educational or scientific purposes as the Trustees shall deem advisable, including but not limited to establishing, operating and maintaining a laboratory for vascular research which will examine and report on patients without reference to creed, color or religion and without excluding any patients solely because of their inability to pay all or any part of the normal fees for any services rendered; provided, however, that: (a) The trust property, including principal and income shall be used only in the United States or its possessions; (b) No part of the net earnings of the trust shall inure to the benefit of any private shareholder or individual; *347 (c) No substantial part of the activities of the trust shall be carrying on propaganda or otherwise trying to influence legislation; (d) No officer, trustee, member or employee of the trust shall receive any pecuniary profit from the operation thereof, except reasonable compensation for services rendered in effecting one or more purposes of the trust; and (e) The trust shall not: * * *
(3) Make any part of its services available on a preferential basis, to: * * *
The Grantor or any other person who has made a substantial contribution to the trust * * *
The trust property, or any part thereof, may on direction of the Trustees, be distributed to any charitable, educational or scientific corporation, trust, fund, or foundation, no part of the net earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which is carrying out propaganda or otherwise attempting to influence legislation; provided further, that such distributions are to be used exclusively within the United States or its possessions, and all within the absolute discretion of the Trustees, subject only to the limitations of this agreement. * * *
11. The Trustees *348 shall have the right to amend this trust agreement at any time and from time to time by written instrument duly executed and filed with the records of the trust; provided, however, that no amendment shall have the effect of giving the Grantor, any donor or Trustee any right or interest in the trust property or diverting any part of the trust property from use for the charitable, educational or scientific purposes herein specified. In the event this agreement is terminated, the trust shall continue for the sole purpose of distributing the trust property then held by the Trustees in accordance with the charitable, educational or scientific purposes specified in paragraph 2. * * *
Said document was not amended or supplemented in writing during the period September 9, 1954, to December 31, 1955. The Foundation was on a fiscal year basis, the first fiscal year ending July 31, 1955. Petitioner filed his (joint) income tax return for 1955 on a calendar year basis. The laboratory of the Foundation was located in a room adjoining the office of petitioner. Both rooms were leased as a unit and petitioner apportioned the cost of the rent and utilities between his office and the room used as the *349 laboratory. The laboratory contained an auxiliary refrigeration unit to control the temperature and humidity, a hospital bed, and electric potentiometer for measuring skin temperatures, a plethysmograph for measuring the pulsations in the fingertips and toetips, and an oxygen tent. From the establishment of the Foundation in 1954 until January 1, 1956, the petitioner continued in the private practice of medicine. During this time, however, petitioner and Rivers supervised and managed the actual operations of the Foundation without compensation. Rivers was also engaged in the private practice of medicine. J. J. Cranley, Sr., the third trustee, did not actively participate in the management of the Foundation. Petitioner's practice in vascular surgery related basically to arteries and veins, the bigger or more common segment being veins. The Foundation was concerned only with patients having arterial diseases. During 1954 and 1955, petitioner used the Foundation in connection with his private practice on numerous occasions. The patients paid the Foundation for the use of its facilities. Ordinarily the Foundation charged a set fee of $35 for the tests and examination. The set fee was waived *350 or reduced when the patient was unable to pay all or a part of the fee. The tests took about 4 hours to administer. The patient was charged a consultation fee by his doctor - not necessarily Cranley. The tests were used in diagnosis and treatment of patients' illnesses as well as for research purposes. During its first fiscal year, from September 1954 to July 31, 1955, the Foundation examined 25 patients for total fees of $545, and at least ten patients paid reduced fees during this period. There is no evidence of the number of patients examined or the number paying reduced fees during the entire second fiscal year or during the part of such fiscal year from August 1 to December 31. The Foundation was open to and used by other physicians in the area. The record does not disclose the number or frequency of such use. From its founding until July 1955, the Foundation employed a nurse and a parttime research worker. In July of 1955, a full-time research fellow, Raymond G. Krause, a surgeon, was also employed. His compensation was $3,000 per annum. The nurse employed by the Foundation was used by petitioner in his private practice without additional compensation. The correspondence of the *351 Foundation was handled by a secretary employed by petitioner. The secretary devoted 40 per cent of her time to the Foundation. The Foundation paid no part of her compensation. The Foundation, from its inception, has carried on a research program into arterial disease. Detailed records and photographs were kept throughout the course of treatments for the purpose of obtaining objective proof of the condition and changes in condition of patients under treatment. When patients were called back for restudy, no additional charge was made. The records and studies of the Foundation were used by petitioner in connection with a class taught by him at a medical school. They were also used by petitioner and Krause as a basis for lectures given by them at staff meetings at various hospitals, articles in scientific journals, and for papers presented at medical association meetings. The Foundation established the only artery bank in Cincinnati at a local hospital. Here arteries of diseased persons were sterilized, dried out, frozen dried, preserved, and stored for future use by physicians who transplanted these for damaged arteries of patients. The bank was started sometime in 1955 or 1956, and *352 ceased operation with the development of synthetic arteries. During its first fiscal year from September 9, 1954, to July 31, 1955, the Foundation requested and received a grant from the Hoffman-LaRoche Company for $5,000. It also received a contribution of $50 from a local physician. During the second fiscal year, contributions included another $5,000 grant from the Hoffman-LaRoche Company, $100 from J. J. Cranley, Sr., and $500 worth of surgical supplies. Petitioner, during the calendar year 1955, contributed $7,550 to the Foundation and claimed a charitable deduction in that amount on his 1955 income tax return. The record does not disclose whether the contribution of $7,550 was a single contribution or whether it comprised two or more contributions. The record also fails to disclose the date or dates of the contributions in 1955 or the amount or amounts (other than the total of $7,550) of each such contribution. The books and records of the Foundation were always kept by an assistant bookkeeper and audited by a certified public accountant. They were always under the supervision of petitioner and kept in the same room with the records of petitioner's private practice. Pursuant to *353 a resolution passed on the same day the trust was executed, petitioner was authorized to act in nondiscretionary matters for the Foundation. He was to have sole custody of the funds and investments, power to disburse funds on his sole signature, and the duty to set up and maintain accounts and prepare periodic reports. The funds and investments of the Foundation were fully segregated from those of petitioner's private practice. No funds of the Foundation were misappropriated or commingled by petitioner or by any other person. On January 1, 1956, during its second fiscal year, petitioner and Krause became full time employees of the Foundation. Beginning at that time, Cranley was to receive an annual salary of $24,000 and Krause $5,000. Petitioner received $14,000 of this amount during that part of the second fiscal year beginning January 1, 1956. In the second fiscal year, from January 1, 1956 on, all fees received from patients by petitioner and Krause were turned over to the Foundation and deposited in its account. In April 1956, Krause received an increase in salary to $8,000 per annum due to a substantial increase in income from patients treated by him. His salary was again increased *354 in a subsequent fiscal year. On January 1, 1958, both petitioner and Krause left the Foundation and became associated in the private practice of medicine. The Foundation filed a Fiduciary Income Tax Return, Form 1041, and an Exempt Organization Return, Form 990-A, for its fiscal years ending July 31, 1955, and July 31, 1956. For the years ending July 31, 1955, and July 31, 1956, the Foundation's receipts and disbursements were as follows: Year Ending
7-31-55
7-31-56
Receipts
Fees
$ 545.00
$24,936.80 * *355 Contributions - Cranley
5,500.00
8,042.80
Contributions - Hoffman-
LaRoche Co.
5,000.00
5,000.00
Misc. Contributions
50.00
600.00
Misc. Income
17.50
Total
$11,095.00
$38,597.10
Expenditures
Salaries: J. J. Cranley, Jr.
$14,000.00
Nurse
$ 2,575.00
4,328.36
Research Asst.
250.00
5,668.78
Artery Bank
171.32
Medical laboratory & of-
fice equipment
5,024.02
3,418.22
Rent & utilities
2,115.74
4,376.75
Supplies
25.90
515.85
Linens, laundry
55.51
21.20
Drugs & medical supplies
99.18
602.58
Films for research
95.98
303.15
Insurance
147.28
629.81
Professional fees
208.14
300.00
Dues, subscriptions
17.40
599.20
Misc.
3.81
127.48
Social security taxes
55.00
267.83
Auto rental & expenses
1,313.20
Donations
20.00
Meetings & conventions
668.58
Total
$10,607.97
$37,332.31
Opinion Petitioner, during the calendar year 1955, contributed $7,550 to the Cranley Research Foundation. He deducted this amount as a charitable contribution in his 1955 income tax return. Respondent disallowed the entire contribution. The basic question is whether or not the Foundation, at the time or times the contributions were made, was a foundation operated exclusively for charitable or scientific purposes, and no part of the net earnings of the Foundation inured to the benefit of any individual within the meaning of section 170(c)(2)(B) and (C) of the Code of 1954. [1] *356 The burden of proof rests with petitioner. Since petitioner and his father were two of the three trustees controlling the Foundation, it goes without saying that the operations of the Foundation are to be carefully scrutinized insofar as they relate to the deductions in question. We think it only fair to state, however, that we were very favorably impressed by petitioner (the only witness) and have no reason to question his veracity or good faith. As set forth in our Findings, petitioner was on a calendar year basis, but the Foundation operated on a fiscal year basis, the first fiscal year ending July 31, 1955. This requires us to segregate our discussion into a consideration of at least two periods of time, and, for completeness, we have added a third. The first period may be loosely referred to as Foundation's first fiscal year (ending July 31, 1955). The second is that part of Foundation's second fiscal year running from August 1 to December 31, 1955. The remaining period is that part of Foundation's second fiscal year from January 1 to July 31, 1956. In discussing the first period, we must anticipate the conclusions reached in relation to the second period *357 to the extent of stating that we hold, infra, that petitioner has failed to meet the burden of proving that, during such second period, the Foundation was an organization meeting the requirements of section 170(c)(2)(B) and (C) considered above, which requirements are necessary conditions to the allowance of a deduction as a charitable contribution. We add that a foundation may qualify under section 170(c)(2)(B) and (C) as to one period and fail to qualify with respect to another. John Danz Charitable Trust, 32 T.C. 469, 476-7 (1959), affd. 284 F. 2d 726, (C.A. 9). The reason for the foregoing preliminary discussion now emerges. If the Foundation qualified under section 170 for a period encompassing the full calendar year 1955, the entire contribution in that year would have been allowable, and the exact dates on which the contributions were made in 1955 would be immaterial. Since we hold, infra, that petitioner has not sustained his burden of proving the Foundation's qualifications under section 170 with respect to the period from August 1 to December 31, 1955, we cannot allow any of the claimed contributions made during that period. The record, however, does not disclose the *358 date or dates in 1955 on which the contributions were made or the particular amount or amounts contributed on each date or dates. All we know is the total contribution for the year. Since we do not have the amount or amounts (if any) contributed after July 31, by the same token, we do not know and have no means of calculating the amount or amounts (if any) contributed during the period from January 1 to July 31. As a result, assuming (but not deciding) that the Foundation qualified under section 170 during its first fiscal year (or, more particularly, from January 1 to July 31, 1955), we nevertheless have no basis for allowing a charitable deduction in any amount in relation to that period. Turning particularly to the period from August 1, 1955, to December 31, 1955, (but having in mind that the subsequent period of the Foundation's second fiscal year will be discussed to the extent that it may be significant) it is our view that petitioner has failed to meet his burden of proving that the Foundation, as a donee, met the conditions and requirements of section 170, supra. We do know that Krause came with the Foundation in July of 1955, and also that Cranley received no compensation *359 from the Foundation for any period prior to January 1, 1956. Answers to his counsel's questions by Cranley to the effect that, to the best of his knowledge, the Foundation did not, during its first two fiscal years "violate any of the terms" of the trust instrument, and that its operations "in that period fully complied with the terms of the trust creating it" represent at best his own conclusions on mixed issues of law and fact, and have no significant probative value. We do know that the Foundation had embarked upon two prime projects, namely, better evaluation of patients with peripheral arterial diseases, and a better method of producing vasodilation in the lower extremities. In connection with these objectives, emphasis was also placed upon improvements in the keeping of records, including the taking of large numbers of photographs. The work on the prime projects or studies, however, was integrated with and grew out of information developed in the treatment of patients who paid fees (see discussion infra) to the Foundation for the services of the laboratory. Thus, we have the picture of a dual operation, part being devoted to treatment and part to scientific research. Which, if *360 either, was the primary objective and which was incidental is not established in the record. In any event, the record does not furnish us a basis for holding that the Foundation was operated exclusively for scientific purposes during the period from August 1, 1955, to December 31, 1955, or (to be discussed infra) from January 1, 1956, to the end of the fiscal year. There is evidence that the Foundation charged patients a fixed fee of $35 for the use of the laboratory and the making of tests, but reduced or eliminated the charge if the patient could not pay. There is no evidence of how many patients, if any, paid reduced or nominal charges or no charge at all during the period from August 1 to December 31, 1955. Lorain Avenue Clinic, 31 T.C. 141, 160 (1958). Under the circumstances, petitioner has failed to meet the burden of proving that the Foundation, during the period in question, was operated exclusively for charitable purposes. Respondent argues further that the laboratory was a mere adjunct to Cranley's practice as a vascular surgeon which was largely a referral practice; that the laboratory was next door to his office; that he used it on numerous occasions in his practice; *361 that he received consultation fees from patients making use of the laboratory; and that his practice and the income therefrom were materially enhanced by the establishment of the laboratory. Respondent takes the position, therefore, that a part of the net earnings of the Foundation inured to petitioner's benefit within the meaning of section 170(c)(2)(C). Petitioner's answer is that the laboratory was available to any doctor who wished to make use of it, and, further, that he (Cranley) received no compensation from the Foundation until January 1, 1956. He admits he used the facilities of the laboratory on numerous occasions (the patient paying the fixed charge). The application of section 170(c)(2)(C), however, is not limited to circumstances in which the taxpayer has received a direct monetary return in a form such as dividends. See Horace Heidt Foundation v. United States, 170 F. Supp. 634, 638 (Ct. Cl., 1959); Northwestern Municipal Ass'n. v. United States, 99 F. 2d 460, 463 (C.A. 8, 1938). If petitioner did benefit commercially from the functions of the Foundation even though indirectly through his private practice, the Foundation has not met the conditions prescribed in section 170(c)(2)(C). *362 Mertens Law of Federal Income Taxation (1957), sec. 34.13, p. 38. Respondent's argument relating to this issue is speculative in some respects, but it must be remembered that the burden of proof lies with petitioner. We think that petitioner probably did benefit commercially and to a material extent, but that, in any event, he has failed to produce sufficient evidence to meet the burden of proving the contrary. Based upon our entire discussion relating to the period from August 1, 1955, to December 31, 1955, we conclude that any contributions made by petitioner to the Foundation during said period are not deductible by petitioner. As indicated supra, we consider a third period for completeness of the picture and to avoid any thought that a splitting of the Foundation's fiscal year might have some conjectural significance. We think it clear that it does not. The period now to be considered is that part of the Foundation's fiscal year from January 1 to July 31, 1956. Our analysis of it is in no way favorable to petitioner. Much of what we have said about the period August 1 to December 31, 1955, again applies and need not be repeated. In addition, however, as of January 1, 1956, petitioner's *363 entire practice was amalgamated with the operations of the Foundation. Thereafter, he turned all of his fees as a medical practitioner over to the Foundation, became an employee of the Foundation, and received a salary of $2,000 per month. In the fiscal year of the Foundation ending July 31, 1956, the receipts of the Foundation from "fees" totalled $24,936.80. How much of this was derived from petitioner's regular medical practice, and how much from laboratory tests and examinations is not disclosed. There is no suggestion by petitioner that his medical fees were derived from any source other than the medical services which he rendered as a medical practitioner. Whether or not he was a specialist is not here significant. There is no evidence that his services were primarily for either scientific or charitable purposes. The fact that petitioner received a salary is not of itself determinative. At the same time, it must be noted that there is no evidence to show how much (if any of it) was paid primarily for his services in connection with the research or charitable operations of the Foundation. Any compensation paid to him out of fees collected by or through the Foundation for his services *364 as a practitioner of medicine would clearly appear to inure to his benefit within the meaning of section 170(c)(2)(C). We think there is no need to labor the matter further to demonstrate the fact that petitioner has failed to establish that he is entitled to deduct any of the contributions in issue. In view of our conclusions relating to the claimed charitable deductions, it is unnecessary to discuss the problems which might otherwise arise in relation to limitation of amount of deductions under section 170(b)(1)(A) and (B). Decision will be entered under Rule 50. Footnotes
*. Accounts receivable as of July 31, 1956, were $23,255.
1. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. - * * *
(c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - * * *
(2) A corporation, trust, or community chest, fund, or foundation - * * *
(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and * * *↩